JOHNNY FRANKS and BARBARA FRANKS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CARL COLLINS and JUDY COLLINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Franks v. Commissioner
Docket Nos. 16137-83; 16138-83.
United States Tax Court
T.C. Memo 1988-245; 1988 Tax Ct. Memo LEXIS 273; 55 T.C.M. (CCH) 1009; T.C.M. (RIA) 88245; June 2, 1988. Bart A. Brown, Jr. and Michael H. Brown, for the petitioners. Robert J. Kastl, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax as follows: Docket No.
Petitioners
Year
Deficiency
16137-83
Johnny and Barbara
1977
$ 16,344.42
Franks    1978
1,594.75
16138-83
Carl and Judy Collins
1977
$ 82,659.71
After concessions, [1] the issues for decision involve the proper amount of capital gain and ordinary income reportable by petitioners in 1977 as shareholders of Wolfe County Coal Corporation, a subchapter S corporation. Specifically, we must decide: (1) the amount of cash advance *277 royalties received by Wolfe County Coal Corporation during its taxable year ended January 31, 1977; (2) the amount of Wolfe County Coal Corporation's adjusted depletion basis for purposes of computing gain under section 631(c); [2] and (3) whether certain ordinary deductions claimed by Wolfe County Coal Corporation during its taxable year ended January 31, 1977 are subject to the provisions of section 272. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Johnny Franks and Barbara Franks, husband and wife, resided in Bulan, Kentucky, at the time their petition was filed in this case. They filed their joint Federal income tax *278 return (Form 1040) for 1977 with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner Barbara Franks is a party in this case solely because she filed a joint tax return with her husband for the year in issue. Petitioners Carl Collins and Judy Collins, husband and wife, resided in Hazard, Kentucky, at the time their petition was filed in this case. They filed their joint Federal income tax return (Form 1040) for 1977 with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner Judy Collins is a party in this case solely because she filed a joint tax return with her husband for the year in issue. In 1974, petitioners Carl Collins and Johnny Franks were working for Tarheel Coal, Inc. ("Tarheel"), a coal mining business located in Hazard, Kentucky. Carl Collins was the company's general superintendent and Johnny Franks was its foreman. Their jobs involved overseeing the daily operations of the business, which included mining and processing coal. Tarheel was owned by the Sigmon brothers, James, Charles, Maynard, and Harold. During 1974 Harold Sigmon and his brothers had a falling out, and it was decided that it would be best if Harold left Tarheel *279 and went his own separate way. Harold was bought out by his brothers, and as part of the buy out Harold agreed to a covenant not to compete with Tarheel in certain areas of eastern Kentucky. When Harold Sigmon left Tarheel, petitioners Carl Collins and Johnny Franks went with him. Sigmon, [3] Collins, and Franks then went to Wolfe County, Kentucky, an area not covered by the covenant not to compete. Wolfe County was a new area in that there had previously been little or no mining done there. The three men went there with the intention of buying coal from other counties, processing it in Wolfe County, and then reselling the coal. Out on their own, Sigmon, Collins, and Franks performed the same jobs as when they were with Tarheel. Sigmon was in charge of negotiating their deals, Collins was general superintendent, and Franks was foreman. They eventually acquired some coal leases and mining equipment, and thereafter started mining coal on property located in Wolfe County. *280 In early 1976, Sigmon was approached by the representatives of Jeffrey L. Feldman, Ivan A. Grosz, Richard A. Josephberg, and Barry S. Lyman (hereinafter the "Cralin Group"). The Cralin Group was interested in forming a coal tax shelter and was looking to acquire coal leases or coal reserves. The Cralin Group explained to Sigmon that they were not interested in, nor did they have the capability of operating a coal mine. Therefore, Sigmon, Collins, and Franks (hereinafter sometimes referred to as the "Sigmon Group") would have to provide all the mining services in any deal that was entered into. Sigmon and the Cralin Group subsequently entered into negotiations. Petitioners Collins and Franks were not involved in these negotiations. The Cralin Group planned to form a limited partnership and wanted the limited partnership to acquire the coal leases or coal reserves. They offered the Sigmon Group a cash advance royalty of $ 2,000,000 up front, with some tonnage royalties coming later that would be tied to production. However, in order to effectively market the limited partnership interests to investors, the Cralin Group insisted that the Sigmon Group enter into a long-term coal *281 sales contract with the East Kentucky Power Company, at that time the primary customer of the Sigmon Group. Even though they felt it was not the right time to enter into such a long-term coal sales contract, Sigmon, Collins, and Franks agreed to a long-term sales contract with East Kentucky Power because they felt the $ 2,000,000 offered by the Cralin Group was a very good price for their Wolfe County leases. To implement the transaction, both the Cralin Group and the Sigmon Group set up and/or used various legal entities. See n.4, infra. On April 29, 1976, Wolfe County Coal Corporation ("Wolfe Corporation") was incorporated under the laws of the State of Kentucky. Wolfe Corporation's principal place of business was in Bulan, Kentucky, and its principal business activity was coal leasing. At all times relevant to this case, the 2,000 issued and outstanding shares of stock of Wolfe Corporation were held by Harold Sigmon (49 percent), Carl Collins (41 percent), and Johnny Franks (10 percent). By agreements dated May 5, 1976, June 28, 1976, and October 19, 1976, Quality Coal Sales ("Quality") assigned to Wolfe Corporation all its rights and interests in certain coal leases *282 for the sum of $ 150,000. [4] The leases covered lands and materials located in Wolfe County, Kentucky. Quality was, at all times relevant to the issues in this case, a partnership owned by Harold Sigmon's children (75 percent), Carl Collins (15 percent), and Johnny Franks (10 percent), and was managed by Harold Sigmon. On June 29, 1976, Campton Coal Properties ("Campton") was formed as a limited partnership under the laws of the State of Kentucky. The general partners of Campton were, *283 at all times relevant to the issues in this case, Jeffrey L. Feldman, Ivan A. Grosz, Richard A. Josephberg, Barry S. Lyman (the Cralin Group partners), and Harold Sigmon. By an agreement dated October 19, 1976, Wolfe Corporation subleased its rights under the leases assigned to it by Quality to Campton. The sublease gave Campton the sole and exclusive right to mine and remove all of the merchantable and mineable seams of coal in, on, and underlying the lands described in the coal leases. The term of the sublease was for five years or until all of the merchantable and mineable coal had been removed from the property, whichever occurred later. In return, Campton agreed to pay Wolfe Corporation, on or before the 25th day of each calendar month, a tonnage royalty of $ 2.90 for each ton of merchantable coal mined, removed, and sold during the preceding calendar month. [5] The sublease also provided that Campton could terminate the sublease on 60 days' written notice if, in its opinion, the coal from the property could not be mined and sold at a reasonable profit. *284 As sublessee, Campton agreed to pay Wolfe Corporation an advance royalty of $ 5,490,000, consisting of $ 2,470,000 in cash and $ 3,020,000 in the form of a nonrecourse promissory note. To Sigmon, Collins, and Franks, the key to the deal was the large cash advance royalty. They were not concerned with, nor did they expect to receive payment on the $ 3,020,000 nonrecourse note. [6]
Late in the negotiations the Cralin Group proposed to increase the cash portion of the advance royalty from $ 2,000,000 to $ 2,470,000. The Cralin Group sought to increase the leveraged write-off for the Campton partnership's investors and thereby make the tax shelter more marketable to investors. However, the cash advance royalty paid directly to the Wolfe Corporation remained $ 2,000,000. The $ 2,000,000 was paid to Wolfe Corporation on October 19, 1976, when Campton closed the formation of the limited partnership. It was paid from *285 the escrow account of Cralin Associates, Inc., the account into which all the Campton investors' funds had been deposited. The sum of $ 470,000 was retained by Cralin Associates, Inc., as its fee from Wolfe Corporation for securing the Campton partnership as sublessee under the sublease, arranging the financing for the transaction, and for obtaining the investors in the partnership. [7]Cralin Associates, Inc., was a corporation owned by the four Cralin Group partners. The total $ 5,490,000 advance royalty was subject to recoupment against the first 3,921,429 tons of coal mined, removed, and sold from the property at the rate of $ 1.40 per ton. *286 There was also payable to Wolfe Corporation a minimum annual royalty of $ 10,000, payable each year whether or not the tonnage royalty produced that amount. The Private Offering Memorandum of Campton's limited partnership interests included an independent engineer's report prepared by the Robinson & Robinson Division of NUS Corporation, Charleston, West Virginia. The report was dated May 21, 1976, was addressed to Harold A. Sigmon, and had originally been prepared for Harold A. Sigmon & Associates. Robinson & Robinson inspected and evaluated the Wolfe County property, and its report contained its estimate of the property's recoverable coal reserves. The report estimated the proven and probable coal reserves on the property to be 5,437,000 tons, with 4,519,000 tons estimated as proven, and 918,000 tons estimated as probable. The report stated that of these 5,437,000 estimated recoverable tons, 834,000 contained an excessive amount of reject or noncombustible matter, and that therefore it would take a substantial (50 percent) increase in the price of coal and cleaning facilities to justify recovery of this tonnage. No analyses were made by Robinson & Robinson as to the quality *287 of the coal that they estimated was recoverable from the Wolfe County property. The coal industry routinely relies on engineering reports such as the Robinson & Robinson report in determining coal reserves. Campton, through Al Mining Company, Inc. ("Al Mining"), started mining coal on the Wolfe County property on October 22, 1976. Al Mining was another corporation owned by the Sigmon Group. The coal mined from the Wolfe County property had a low BTU rating and a high ash and sulphur content, indicative of very low quality coal. The Sigmon Group was aware of the poor quality of the coal before the Campton coal shelter deal came along. [8] The coal mined was of such low quality that it could not meet the quality requirements of the sales contract with East Kentucky Power. East Kentucky Power eventually voided the sales contract in January of 1977 due the low quality of the coal. Campton could not find any other buyers for the coal mined in Wolfe County due to the coal's low quality. However, at the insistence of Ivan Grosz and Harold Sigmon, Al Mining continued to mine the property for Campton through July 1978, when all mining operations on the property were shut down. Al Mining *288 lost money every month that it mined the Wolfe County property for Campton, but its shareholders Sigmon, Collins, and Franks were willing to have the corporation incur these losses because of the $ 2,000,000 that Wolfe Corporation received under the sublease. As of January 31, 1977, only 34,152.35 tons of coal had been mined from the Wolfe County property. Under the sublease, Campton, acting through Al Mining, mined the following total amounts of coal from the Wolfe County property: Period
Tons of Coal Mined
10/22/76 to 1/31/77
34,152.35 2/1/77 to 1/31/78
117,096.25
2/1/78 to 8/31/78
80,717.90 Total Tons Mined     231,966.50
On its U.S. Small Business Corporation Income Tax *289 Return (Form 1120S) for the taxable year ended January 31, 1977, Wolfe Corporation reported gross royalty income of $ 2,523,529. All of the royalty income reported by Wolfe Corporation was attributable to the sublease with Campton. Of the $ 2,523,529 of gross royalty income reported, $ 2,484,472 (98.45 percent) qualified for long-term capital gains treatment under section 631(c), and $ 39,059 (1.55 percent) constituted ordinary income. [9] In accordance with the terms of the sublease and the Private Offering Memorandum, Wolfe Corporation reported cash advance royalties received in the amount of $ 2,470,000. Against the $ 2,484,472 gross royalties reported under section 631(c), Wolfe Corporation deducted in full the $ 470,000 fee retained by Cralin Associates, Inc., at the closing of the Campton limited partnership. Wolfe Corporation also deducted in full other fees incurred in October of 1976 in connection with the Campton sublease in the amount of $ 64,753. The *290 $ 64,753 consisted of $ 37,500 paid to William Eldridge as a finder's fee for his services rendered in locating the Cralin Group, and $ 27,253 paid to Maxwell Barrett as legal fees. [10] In addition, Wolfe Corporation claimed a depletion deduction of $ 51,150 based on its $ 150,000 cost basis in the leases purchased from Quality. The depletion deduction claimed was approximately one-third (34 percent) of this $ 150,000 cost basis. Harry Hudson, the accountant who prepared the January 31, 1977 return, may have utilized the estimate of recoverable tons contained in the Robinson & Robinson engineer's report in computing this depletion deduction. [11] This cost depletion deduction of $ 51,150 has not been challenged by respondent. See n.10, supra. Wolfe Corporation also claimed the following ordinary deductions (among others) on its January 31, 1977 tax return: Accounting fees
$ 1,236
Office expenses
29
Wages
[12] 3,350
FUTA taxes
107
Amortization
52
$ 4,774
*291 The $ 1,236 for accounting fees was for regular day-to-day accounting services. During its taxable years ending January 31, 1978 and January 31, 1979, Wolfe Corporation, whose subchapter S status had terminated because of receipt of excessive passive income, received gross royalty income in the amounts of $ 231,805 and $ 128,358, respectively. All of this royalty income was attributable to the Campton sublease. On their respective individual income tax returns for the calendar year 1977, petitioners Johnny Franks and Carl Collins each reported his distributive share of ordinary income and long-term capital gain reported by Wolfe Corporation on its January 31, 1977 tax return. In separate notices of deficiency to petitioners Franks and Collins dated March 23, 1983, respondent determined deficiencies in their 1977 Federal income tax due to adjustments made to the subchapter S corporation's return. Respondent's adjustments to Wolfe Corporation's taxable income for its taxable year ended January 31, 1977 were as follows: (1) Respondent disallowed the deductions taken by Wolfe Corporation for the fee retained by Cralin Associates, Inc., ($ 470,000), for the finder's fee *292 ($ 37,500), and for the legal fees ($ 27,253) paid in connection with the sublease. These deductions, totaling $ 534,753, were disallowed by respondent by decreasing Wolfe Corporation's basis $ 526,476 in computing its long-term capital gain, and by decreasing its ordinary deductions $ 8,277. (2) Instead, an amortization deduction for the $ 534,753 amount disallowed was allowed on a straight-line basis over 18.63 years. The deduction allowed for the taxable year ended January 31, 1977 was $ 4,784, allocated $ 4,710 to the capital gain and $ 74 to the ordinary income. [13]
(3) Of the $ 4,774 of ordinary deductions claimed for accounting fees, office expenses, *293 wages, FUTA taxes, and amortization, $ 4,700 were disallowed as expenditures described in section 272. The $ 4,700 was applied by respondent as deductions against the section 631(c) capital gain, as prescribed by that section. OPINION The first issue for decision is the proper amount of cash advance royalties reportable by Wolfe Corporation during its taxable year ended January 31, 1977. On its Form 1120S income tax return for that year, Wolfe Corporation reported cash advance royalties of $ 2,470,000. This reporting position was consistent with the terms of the sublease between Wolfe Corporation and Campton and with the Private Offering Memorandum for the Campton limited partnership interests. From the amount of gross royalties reported on this return, Wolfe Corporation deducted the $ 470,000 fee retained by Cralin Associates, Inc. ("Cralin, Inc."), at the closing of the Campton limited partnership. Contrary to their S corporation's reporting position, petitioners now contend, however, that the $ 470,000 retained by Cralin, Inc., did not constitute gross income of Wolfe Corporation, and thus the proper amount of reportable cash advance royalties was only $ 2,000,000. Petitioners *294 advance two theories in support of their contention. First, petitioners say the $ 470,000 did not constitute gross income of Wolfe Corporation because it was never received by Wolfe Corporation, either actually or constructively. Generally, under the cash receipts and disbursements method of computing taxable income, which Wolfe Corporation utilized, all items constituting gross income are to be included for the taxable year in which actually or constructively received. Sec. 1.446-1(c)(1)(i), Income Tax Regs. Income is constructively received by a taxpayer in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. Sec. 1.451-2(a), Income Tax Regs. Petitioners argue that under these rules Wolfe Corporation did not actually or constructively receive the $ 470,000 retained by Cralin, Inc. We disagree. We first note that this case does not involve an issue of constructive receipt as such. With regard to whether the $ 470,000 was actually received by Wolfe Corporation, it is *295 well settled that income is not limited to the direct receipt of cash. Crane v. Commissioner,331 U.S. 1, 15 (1947); Poczatek v. Commissioner,71 T.C. 371, 376-377 (1978). The payment of a legal obligation of a taxpayer is income to the taxpayer even though such income is not actually received by him. Old Colony Trust Co. v. Commissioner,279 U.S. 716, 729-730 (1929); Schaeffer v. Commissioner,258 F.2d 861, 864 (6th Cir. 1958), affg. a Memorandum Opinion of this Court, cert. denied 360 U.S. 917 (1959); Huff v. Commissioner,80 T.C. 804, 814 (1983). In the present case, both the Private Offering Memorandum of the Campton limited partnership and the tax opinion letter prepared by Campton's tax counsel which accompanied the Private Offering Memorandum describe the $ 470,000 as a fee to be paid by Wolfe Corporation. Each document states that on the closing date of the transaction Wolfe Corporation will pay Cralin, Inc., $ 470,000 as a fee for securing the partnership (Campton) as sublessee under the sublease, for arranging the financing of the transaction, and for obtaining investors *296 in the partnership. As detailed in our findings of fact, this is what actually occurred at the closing of the transaction. Based on this evidence, we find that Wolfe Corporation was obligated to pay the $ 470,000 fee to Cralin, Inc. Therefore, when Cralin, Inc., retained the $ 470,000 at the closing, Wolfe Corporation received an immediate economic benefit equal to the fee that was paid. See Tucker v. Commissioner,69 T.C. 675, 679 (1978). Thus, under Old Colony Trust Co. v. Commissioner, supra, the $ 470,000 fee retained by Cralin, Inc., constituted gross income of Wolfe Corporation even though it was never actually received. Petitioners recognize that their contention that the proper amount of cash advance royalties reportable by Wolfe Corporation was $ 2,000,000 and not $ 2,470,000 is inconsistent with the terms of the sublease and the other documents in evidence. Petitioners argue, though, that the substance of the transaction relating to the $ 470,000 retained by Cralin, Inc., differed from the form in which it was cast. However, just as respondent in determining income tax liabilities may look through the form of a transaction to its substance, *297 Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Gregory v. Helvering,293 U.S. 465 (1935), so, as a general rule, may he bind a taxpayer to the form in which the taxpayer has cast a transaction. Commissioner v. National Alfalfa Dehydrating & Milling Co.,417 U.S. 134 (1974); Spector v. Commissioner,641 F.2d 376, 381 (5th Cir. 1981), revg. 71 T.C. 1017 (1979), cert. denied 454 U.S. 868 (1981). Moreover, in Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967), the Court of Appeals for the Third Circuit stated the rule that: a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [Commissioner v. Danielson,378 F.2d at 775.]
The policies behind the "Danielson rule" include not encouraging *298 parties unjustifiably to risk litigation after consummation of a transaction in order to avoid the tax consequences of their agreements. Similarly, if these types of attacks were allowed, respondent would not be able to accept taxpayers' agreements at face value and would be confronted with the necessity of litigation against both parties to the agreement in order to collect taxes properly due. 378 F.2d at 775. This Court has not adopted the Danielson rule as set forth by the Third Circuit. Elrod v. Commissioner,87 T.C. 1046, 1065 (1986); Coleman v. Commissioner,87 T.C. 178, 202 and n.17 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987); G C Services Corp. v. Commissioner,73 T.C. 406, 412 and n.2 (1979). The standard applied by this Court is the less stringent "strong proof" rule. Coleman v. Commissioner, supra,87 T.C. at 202. It requires the taxpayer to present "strong proof," that is, more than a preponderance of the evidence, that the terms of the written instrument do not reflect the actual intentions of the contracting parties. Elrod v. Commissioner, supra,87 T.C. at 1066, *299 G C Services Corp. v. Commissioner, supra,73 T.C. at 412. However, the Sixth Circuit, to which an appeal in this case would lie, has indicated its acceptance of the Danielson rule. Patterson v. Commissioner,810 F.2d 562, 572 (6th Cir. 1987), affg. a Memorandum Opinion of this Court; Schatten v. United States,746 F.2d 319, 322 (6th Cir. 1984). Thus, while we still adhere to our strong proof standard, we are bound to apply the Danielson rule in the instant case. [14]Golsen v. Commissioner,54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). *300 In arguing that we should look behind the express terms of the sublease between Wolfe Corporation and Campton, petitioners do not contend that the sublease was entered into under any mistake, undue influence, fraud, duress, or the like. Instead, petitioners argue that the present case is distinguishable from Danielson, citing our opinion in Freeport Transport, Inc. v. Commissioner,63 T.C. 107 (1974). In Freeport, the Commissioner took inconsistent positions with respect to a sale-of-a-business agreement. The agreement provided that as part of the sale the seller (an individual) would be employed by the buyer (a corporation) for two years following the sale and would receive a stated salary for his services. On his income tax return for the second year after the sale, the seller-individual reported the amount received, which was stated as salary in the agreement, as capital gain from the sale of the business. On its income tax return for the same year, the buyer-corporation deducted the amount paid as compensation for services. With respect to the seller, the Commissioner determined that the amount he received constituted compensation for services (ordinary *301 income), and with respect to the buyer, the Commissioner determined that the amount paid constituted part of the purchase price of the business and therefore should have been capitalized. The two cases were consolidated for trial, and we held that the Danielson rule did not prevent the taxpayer-seller from offering proof contrary to the written agreement of sale. Freeport Transport, Inc. v. Commissioner, supra,63 T.C. at 116. We found no need to invoke the Danielson rule in that case since both parties to the agreement were before the Court and since the Commissioner also offered proof tending to show that the agreement did not truly represent the facts of the transaction. 63 T.C. at 116. Petitioners argue that the situation in the present case is similar to that in Freeport. We disagree. In the present case only one of the parties to the sublease, Wolfe Corporation (a subchapter S corporation appearing through its shareholders), is before the Court. Moreover, here respondent is seeking to hold petitioners to the express terms of the sublease. Therefore, the basis upon which we distinguished Danielson in the Freeport case is *302 not present here. Thus, applying Danielson, we find that the proper amount of cash advance royalties reportable by Wolfe Corporation for its taxable year ended January 31, 1977 was $ 2,470,000, the amount stated in the sublease. [15]
*303 The next issue for decision is the deductibility by Wolfe Corporation of three items, the $ 470,000 fee paid to Cralin, Inc., the $ 37,500 finder's fee paid for services rendered in locating the Cralin Group, and the $ 27,253 in legal fees paid in connection with the Campton sublease. These three fees were deducted in full by Wolfe Corporation on its January 31, 1977 income tax return. The proper treatment of these items requires some explanation as to the treatment of the advance royalties themselves. Section 631(c) provides that in the case of the disposal of coal held for more than six months (nine months for taxable years beginning in 1977 and twelve months thereafter) by the owner thereof under any form of contract by virtue of which the owner retains an economic interest in the coal, the difference between the amount realized from the disposal and the owner's "adjusted depletion basis" in the coal plus the deductions disallowed for the taxable year under section 272 is considered as though it were a gain or loss on the sale of such coal. [16] This language describes a lease of mining rights in return for royalties based on production. S. Rept. 781, 82d Cong., 1st Sess. (1951), *304 1951-2 C.B. 458, 488. Under such an arrangement, a lessor of coal rights has "retained an economic interest" in the coal because his royalty income depends on the amount of coal mined. See Palmer v. Bender,287 U.S. 551, 557 (1933); sec. 1.611-1(b), Income Tax Regs.
*305 In short, section 631(c) treats royalty income or loss under a coal lease as having been realized in a sale or exchange. In addition, section 1231(b)(2) [17] treats section 631(c) coal as "property used in the trade or business." See sec. 1.1231-1(c)(3), Income Tax Regs. Taken together, the two sections treat the net royalty income of a coal lessor as capital gain or any net royalty loss as ordinary loss. Advance royalty payments received by an owner of coal qualify under section 631(c) where the contract of disposal grants the lessee (or sublessee) the right to apply the advance royalties in payment of coal mined at a later time. Sec. 1.631-3(c)(1), Income Tax Regs. Since the cash advance royalties paid by Campton to Wolfe Corporation were subject to recoupment against the first 3,921,429 tons of coal mined, removed, and sold from the property, section 631(c) applies to the advance royalties received by Wolfe Corporation under the sublease. Moreover, Wolfe Corporation's section 631(c) gain on the advance royalties qualifies for long-term capital gains treatment under section 1231 because Wolfe Corporation had no other section 1231 gains or losses during its taxable year ended *306 January 31, 1977. See sec. 1231(a). As previously stated, gain under 631(c) is measured by the difference between the amount realized from the disposal of the coal and its "adjusted depletion basis" plus the deductions disallowed under section 272. Section 272 provides generally that where coal (or iron ore) is disposed of under a royalty contract, no deduction is allowed for expenditures attributable to the making and administering of the contract under which the disposition occurs.[18] Under section 272, the expenditures attributable to the making and administering of the royalty contract cannot be deducted from ordinary income. Instead, the expenditures must be offset against the capital gain income under section 631(c). See Davis v. Commissioner,74 T.C. 881, 891-892 (1980), affd. 746 F.2d 357 (6th Cir.1984); Higgins Co. v. United States,444 F. Supp. 1 (D. Minn. 1977), affd. per curiam 566 F.2d 595 (8th Cir. 1977). *307 The regulations under section 272 provide examples of expenditures which, if attributable to the making and administering of the contract, are subject to section 272. The examples listed in the regulations include legal and technical expenses incurred in connection with the contract. [19] As we described the purpose of section 272 in Davis v. Commissioner, supra,74 T.C. at 892: Applying only to taxpayers disposing of coal (or iron ore) under section 631(c), section 272 accomplishes two tasks. First, overhead and administrative costs associated with a coal royalty contract are factored into the section 1231 equation and their deduction otherwise is disallowed. See secs. 1.272-1(a) and 1.631-3(a)(1), Income Tax Regs. In effect, section 272 treats administrative expenses as part of the cost of the coal disposed of under the lease. Second, if a coal lessor realizes a net loss for the year under section 1231, excess administrative costs and depletion basis are expressly made deductible from ordinary income. Sec. 1.272-1(c), Income Tag Regs. [Fn. ref. omitted.]
However, section 272 does not apply to capital expenditures, and such expenditures are not taken *308 into account in computing gain or loss under section 631(c) except to the extent they are properly part of the depletable basis of the coal. Sec. 1.272-1(b)(1), Income Tax Regs.
*309 We must determine whether the $ 27,253 in legal fees paid in connection with the sublease was originally an ordinary expense (and therefore subject to section 272), or was a capital expenditure (and therefore not subject to section 272). The Supreme Court has held that the applicable test in this area would be whether the origin of the expense was "in the process of acquisition itself." Woodward v. Commissioner,397 U.S. 572, 577 (1970). Here, since the parties have stipulated that the legal fees were incurred for services rendered in connection with the sublease, we find that the $ 27,253 in legal fees constituted a capital expenditure. Thus, the legal fees are not subject to 272. Instead, they form part of Wolfe Corporation's depletable basis in the coal. Commissions paid by a lessor in securing a lease are also capital expenditures. Munger v. Commissioner,14 T.C. 1236, 1238 (1950); Young v. Commissioner,59 F.2d 691 (9th Cir. 1932), affg. 20 B.T.A. 692 (1930), cert. denied 287 U.S. 652 (1932). Therefore, we find that the other two expenditures in issue, the $ 470,000 fee paid to Cralin, Inc. *310 , and the $ 37,500 finder's fee were also capital expenditures incurred in securing the Campton sublease. Therefore, section 272 does not apply to the three expenditures totaling $ 534,753 discussed above, and that amount is to be considered only as part of the depletable basis in the coal. The parties in the case agree that during its taxable year ending January 31, 1977, Wolfe Corporation received royalties qualifying for long-term capital gains treatment under section 631(c) in the amount of $ 2,484,472. Petitioners initially argue from the three expenditures in issue constitute proper deductions from the $ 2,484,472 in royalties received for purposes of determining Wolfe Corporation's amount realized under section 631(c). Petitioners draw our attention to several revenue rulings and cases that hold that selling expenses incurred by a taxpayer in connection with the sale or disposition of property constitute deductions from the amount realized for purposes of determining gain or loss. [20] Petitioners ask us to conclude that since the expenditures in issue in the present case were incurred in connection with the execution of the coal sublease, Wolfe Corporation is entitled to *311 reduce the amount of royalties it received by these expenditures in determining its amount realized under section 631(c). We think petitioners' reliance on these revenue rulings and cases is misplaced. The selling expenses involved in the revenue rulings and cases cited by petitioners were expenses that, absent their connection with the sale or disposition of the property involved, would ordinarily constitute current deductions from ordinary income. However, we have previously found that the expenditures in issue in the present case were capital expenditures and not current deductions from ordinary income. As will be discussed below, these capital expenditures form part of Wolfe Corporation's adjusted depletion basis. Therefore, the royalties received under the sublease are not reduced by the expenditures in determining Wolfe Corporation's amount realized under section 631(c). Thus, Wolfe Corporation's amount realized under section 631(c) remains $ 2,484,472. *312 We must now determine the proper method for computing Wolfe Corporation's adjusted depletion basis under section 631(c). Under section 631(c), the term "adjusted depletion basis" means the basis for allowance of cost depletion provided in section 612 and the regulations thereunder. Sec.1.631-3(b)(2), Income Tax Regs. The basis upon which cost depletion is to be allowed under section 612 is the cost or other adjusted basis of the mineral produced as those terms are defined in sections 1011, 1012, and 1016. Secs. 1.611-2(a), 1.612-1(a), Income Tax Regs. In the present case, this basis would be the amount of the capital expenditures, $ 526,476. [21] Wolfe Corporation's adjusted depletion basis for the year in issue is the proportion of this $ 526,476 depletable basis which the amount of royalties received in the current year bears to the total amount of royalties to be received under the sublease. Secs. 1.612-3(a)(1) and (b)(1), 1.631-3(c), Income Tax Regs.; see also sec. 1.631-2(d), Income Tax Regs. Stated as a formula, [22] Wolfe Corporation's adjusted depletion basis is: Royalties received in current year ($ 2,484,472)
X
Depletable
=
Adjusted
/ Royalties received in current year plus
Basis
Depletion
estimated future royalties to be received
($ 526,476)
Basis
($ 2,484,472 + ?)
*313 In applying this formula to determine Wolfe Corporation's adjusted depletion basis, the parties dispute only the amount of estimated future royalties that were to be received by Wolfe Corporation under the sublease. Respondent argues that at January 31, 1977, the only credible information available to Wolfe Corporation to estimate the number of tons of coal to be mined from the property, and therefore the amount of future royalties Wolfe Corporation would be receiving under the sublease, was the Robinson & Robinson engineering report. Engineering reports are routinely relied upon in the coal industry in determining coal reserves. See sec. 1.611-2(c), Income Tax Regs. Respondent supports his argument by pointing to the depletion deduction claimed by Wolfe Corporation on its $ 150,000 cost basis in the coal leases that were involved in the sublease. This depletion deduction claimed by Wolfe Corporation on its January 31, 1977 income tax return was approximately one-third of the $ 150,000 cost basis Wolfe Corporation had in the leases, and may have been based in some way on the engineering report's estimate that over five million tons of coal were recoverable from the property. See *314 n.11, supra. This depletion deduction was not challenged by respondent on audit nor was it raised as an issue in the notices of deficiency issued to petitioners. Respondent argues that the engineering report's estimate of recoverable coal reserves should therefore also be used in computing the adjusted depletion basis in issue. Petitioners argue that in computing Wolfe Corporation's adjusted depletion basis a much smaller figure should be used for the amount of Wolfe Corporation's total royalties (current plus estimated future royalties) to be received under the sublease. Petitioners say we should not rely, as respondent does, on the Robinson & Robinson engineering report's estimate of recoverable tons of coal from the Wolfe County property. Instead, petitioners contend that $ 2,650,000, the approximate amount of net royalties that were actually received by Wolfe Corporation during the three taxable years coal was mined under the sublease, is the amount that should be used as Wolfe Corporation's "total royalties to be received * * * under the Sublease" in computing its adjusted depletion basis. In situations where it is necessary to estimate or determine with respect *315 to any mineral deposit as of any specific date the total recoverable units (e.g., tons) of mineral products reasonably known, or on good evidence believed, to have existed in place as of that date, the estimate of determination must be made according to the method current in the industry and in the light of the most accurate and reliable information available. Sec. 1.611-2(c)(1), Income Tax Regs.[23] Thus, the regulations speak of estimates that are "reasonably known," or "on good evidence believed" to have existed. See Murphy Oil Co. v. Burnet,287 U.S. 299 (1932). In addition, section 1.611-2(c)(1), Income Tax Regs., further provides that any estimate of the recoverable units in a mineral deposit shall include an estimate as to "both quantity and grade." (Emphasis supplied.) As previously stated, independent engineers' reports are routinely relied upon in the coal industry for determining coal reserves. The engineer's report involved in the present case estimated the "proven" and "probable" coal reserves on the Wolfe County property to be 5,437,000 tons. While the report contained a detailed analysis of the number (quantity) of tons that were recoverable, *316 it specifically stated that no analyses were made regarding the quality (grade) of the coal that was recoverable from the property. The report stated that an analysis of the quality of the coal reserves "was not within the scope of the investigation." We find this particularly relevant in the present case. *317 In determining whether the estimate of recoverable reserves contained in the engineer's report was reasonable, we first note that the report does not comply with respondent's regulations because it did not contain an estimate of the recoverable coal's grade or quality. An unambiguous statute or regulation must be given effect according to its plain and obvious meaning. United States v. Western Pacific Railroad Co.,385 F.2d 161, 163 (10th Cir. 1967), cert. denied 391 U.S. 919 (1968); Christner v. Poudre Valley Cooperative Association,235 F.2d 946, 950 (10th Cir. 1956); Collums v. United States,480 F. Supp. 864, 869 (D. Wyo. 1979). We find the above regulation unambiguous, and respondent does not argue otherwise. Therefore, in view of the underlying facts surrounding the mining operations at January 31, 1977, and the fact that the report's estimate was silent as to the quality of the recoverable reserves, we find, as further detailed below, that the engineering report's estimate of 5,437,000 tons of recoverable coal reserves from the Wolfe County property was not a reasonable estimate. Under the sublease, Campton *318 agreed to pay Wolfe Corporation a tonnage royalty of $ 2.90 for each ton of merchantable coal mined, removed, and sold. Campton started mining on the property on October 22, 1976. From the beginning, the coal mined from the property could not meet the quality requirements of Campton's sales contract with East Kentucky Power. Due to the low quality of the coal East Kentucky Power voided the sales contract in January 1977. In fact, due to its low quality, the coal was virtually unmarketable in that area at that time. As of January 31, 1977, only 34,152 tons of coal had been mined from the property and the outlook for the future was bleak. Indeed, only about 200,000 more tons were mined form the property over the next year and a half before the mining operations on the property were finally shut down in July 1978. Thus, the bleak outlook for future mining that existed on January 31, 1977 ultimately was proven to be accurate. Based on these facts, we find the engineering report's failure to analyze the quality of the coal to be mined from the property renders its estimate of the quantity of recoverable reserves unreasonable. In arguing that the report's estimate of 5,437,000 *319 recoverable tons should be used in computing the total amount of royalties to be received by Wolfe Corporation under the sublease, respondent makes two contentions. First, respondent argues that Wolfe Corporation utilized the report's estimate of 5,437,000 tons in computing its depletion deduction on its January 31, 1977 tax return. Respondent argues that this was an objective manifestation by Wolfe Corporation that at January 31, 1977 the engineer's report was the best estimate of the amount of future royalties that would be received under the sublease. As detailed in our findings of fact, the sole evidence in the record regarding the computation of the depletion deduction is the testimony of Harry Hudson, the accountant who prepared the January 31, 1977 tax return. There exists considerable ambiguity as to the exact method utilized by Hudson in computing the deduction. See n.11, supra. In any event, petitioners are not bound on this issue by the position taken by Wolfe Corporation on its tax return. Casey v. Commissioner,38 T.C. 357, 384 (1962) (taxpayer not bound to position taken on tax return regarding estimate of remaining useful life of property for *320 depreciation purposes). Therefore, even assuming Wolfe Corporation may have used the report's estimate in computing its depletion deduction, which is far from clear,this is just one factor, and in our opinion not a decisive one, to be considered in determining whether the report should be used in computing the total amount of royalties to be received under the sublease. Respondent next argues that petitioners (and Wolfe Corporation) should not be allowed to attack the validity of the engineer's report since they utilized the report, directly or indirectly, to produce the advance royalties received under the sublease. The record reflects that it was the Cralin Group that approached petitioners (through petitioners' business partner, Harold Sigmon). It was the Cralin Group that was interested in forming a coal tax shelter, and thus they were looking to acquire coal leases or coal reserves. When the Cralin Group offered Sigmon and petitioners a $ 2,000,000 cash advance royalty for sublease the property to them, Sigmon and petitioners knew this was a very good price for these Wolfe County leases. There is no direct evidence in the record tying this $ 2,000,000 offer or the later final *321 figure of $ 2,470,000 from the Cralin Group to the estimate of recoverable reserves in the engineer's report. We think the engineer's report was primarily utilized by the Cralin Group in order to market the limited partnership interests in the coal tax shelter they were forming, which depended on both the cash advance royalties and the $ 3,020,000 nonrecourse note. Petitioners and Sigmon knew that little or no mining had previously been done in Wolfe County, and they quickly found out why when they started mining the coal from the Wolfe County property. Even before the coal tax shelter deal came along, the Sigmon Group knew the quality of the coal was poor and that they had to blend it with coal from other areas to meet their customer's standards. As it turned out, only 232,000 tons of coal were actually mined from the property for Campton before all operations were shut down in 1978, even though the engineer's report estimated that there were 5,437,000 tons of recoverable reserves. We therefore conclude that the estimate in the engineer's report that there were 5,437,000 tons of recoverable coal reserves in the Wolfe County property should not be used in determining the total *322 amount of royalties to be received by Wolfe Corporation in computing its adjusted depletion basis under section 631(c). [24]
We agree with petitioners that as of January 31, 1977 it was reasonably clear that no substantial marketable coal reserves were going to be mined from the Wolfe County property. We also agree with petitioners that in computing Wolfe Corporation's adjusted depletion basis under section 631(c), the amount of the total royalties to be received under the sublease should take into account the fact that as of January 31, 1977, no substantial amount of marketable coal was going to be mined from the property. The record in the present case warrants the Court's taking a more economically realistic view of the total amount of royalties *323 to be received by Wolfe Corporation under the sublease. Thus, we conclude that in computing its adjusted depletion basis, the figure to be used for the total amount of royalties to be received should be $ 2,833,692, the amount of gross royalty income actually received by Wolfe Corporation under the sublease. [25]
*324 The remaining issue for decision concerns $ 4,774 of expenditures claimed as ordinary deductions by Wolfe Corporation on its January 31, 1977 income tax return. These expenditures were for accounting fees ($ 1,236), office expenses ($ 29), wages ($ 3,350), FUTA taxes ($ 107), and amortization ($ 52). Respondent disallowed ordinary deductions for $ 4,700 of these expenditures, determining that they were subject to section 272 and therefore only deductible against the section 631(c) capital gain. As discussed earlier, section 272 disallows ordinary deductions for expenditures that are "attributable to the making and administering of the contract" disposing of coal when section 631(c) applies to the disposition. Instead, these section 272 expenditures offset the capital gain income computed under section 631(c). The regulations under section 272 list examples of expenditures that are referred to in section 272. See n.19, supra.The examples listed in the regulations are not intended to be all-inclusive. Sec. 1.272-1(d)(1), Income Tax Regs. However, it is also clear from the examples listed that the types of expenditures contemplated by section 272 are intended to have a direct *325 connection to the contract of disposal, i.e., a cost of obtaining or administering the contract. Davis v. Commissioner, supra,74 T.C. at 892; Higgins Co. v. United States, supra,444 F. Supp. at 5. Petitioners argue that the expenditures in issue were incurred by Wolfe Corporation as general corporate operating expenses and were not incurred in connection with the making and administering of the sublease. There is no evidence to support that assertion. Respondent argues that, based on the record, Wolfe Corporation's sole function was to sublease coal rights to Campton and therefore all expenses incurred by Wolfe Corporation were attributable to the making and administering of the sublease within the meaning of section 272. On this record we must agree with respondent. Wolfe Corporation was incorporated April 29, 1976, several months after the sublease negotiations had begun. Wolfe Corporation's principal business activity was coal leasing. All of the royalty income received by the corporation during its taxable years ending January 31, 1977, 1978, and 1979, was attributable to the sublease with Campton. Petitioners have not shown, and the *326 record does not reflect, that Wolfe Corporation was formed or actually operated for any purpose other than to obtain and administer the sublease with Campton. Accordingly, we sustain respondent's determination that the $ 4,774 of expenditures in issue were incurred in connection with the making and administering of the sublease. Thus, $ 4,700 of these expenditures must be deducted from Wolfe Corporation's section 631(c) capital gain for its taxable year ending January 31, 1977. [26]
*327 To reflect the concessions and the foregoing holdings, Decisions will be entered under Rule 155.
Footnotes
1. Petitioners Johnny and Barbara Franks have agreed to the adjustments made by respondent with respect to 1978, and thus have conceded the deficiency determined for that year. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
3. Harold Sigmon's case, docket No. 16111-83, was originally scheduled for trial with the instant Franks and Collins↩ cases, but was continued and tried separately on the separate issues not common to the other two cases. On the common issues, Harold Sigmon has agreed to be bound by the outcome of this case. 4. Contrary to the stipulation of facts, the assignment dated June 28, 1976 was between Quality Leasing Company as assignor (as opposed to Quality Coal Sales) and Wolfe Corporation as assignee. However, we do not find this difference material to our decision in this case since all three assignments to Wolfe Corporation were signed on behalf of the assignors by petitioner Carl Collins, as a partner, and on behalf of the assignee by Harold Sigmon. The record shows that in addition to the Wolfe Corporation, the Sigmon Group set up and/or used various partnerships and corporations, including Quality Coal Sales, Quality Processing, Al Mining, Superior River Coal Corporation, and possibly others. ↩
5. Specifically, the tonnage royalty was $ 2.90 a ton plus seven percent of Campton's gross sales price in excess of $ 20.00, less the landowners' royalties under the terms of the coal leases. ↩
6. Campton in fact made some payments to Wolfe Corporation on the nonrecourse note during 1976, 1977, and 1978 in the amounts of $ 17,079, $ 67,355, and $ 68,724, respectively. The receipt of these payments and the nonrecourse note itself are not issues in this case. ↩
7. The Private Offering Memorandum for Campton's limited partnership interests expressly provided that: Out of the $ 2,470,000 cash portion of the Advanced Royalty to be paid to Wolfe, on the Closing Date Wolfe will pay $ 470,000 to Cralin Associates, Inc., an affiliate of the Cralin General Partners, as a fee for securing the Partnership as sublessee under the Sublease and in connection with the arranging of the financing of the transactions contemplated by this Memorandum and the obtaining of investors in the Partnership. * * * ↩
8. The Sigmon Group had been mining that coal before the Campton coal shelter deal came along and had been blending that coal with coal from other areas in order to bring it up to their customers' standards. Mr. Franks candidly testified that he was "tired of mining that trashy coal," wanted "to leave Wolfe County" even before that deal, and "didn't know at the time that I was going to be stuck with the actual mining of the coal" for the Campton limited partnership. ↩
9. The ordinary income was listed on Wolfe Corporation's return as follows: ↩
$ 13,576 advanced royalties recouped
14,546 tonnage royalties
10,937 note prepayments
Total
$ 39,059 10. In computing its section 631(c) gain on this January 31, 1977 return, Wolfe Corporation deducted $ 599,864, as its "cost or other basis," from the $ 2,484,472 in royalties received. Of the $ 599,864, at most only $ 534,753 could constitute the three fees mentioned above. What constitutes the remaining $ 65,111 of the $ 599,864 deducted on the return cannot be determined from the record with certainty but it may include the $ 51,150 depletion deduction discussed in the text below. In any event, since only $ 534,753 of the $ 599,864 has been challenged by respondent, we assume the unchallenged $ 65,111 remains deductible in full by Wolfe Corporation independent of our decision on the deductibility of the $ 534,753 of expenditures. ↩
11. Hudson's testimony regarding computation of the depletion deduction was as follows: Q. Now against that amount [$ 150,000], you have accumulated depletion of $ 51,150. Do you recall how you computed that, Mr. Hudson? A. No, but I reviewed this return before coming up here, and I don't believe there's a schedule of that computation. Q. Do you have any present recollection? A. No. I can only presume that we estimated that approximately one-third of the tons that we estimated to be there were mined that year. MR. KASTL: May I approach the witness, Your Honor? THE COURT: Yes, you may. BY MR. KASTL: Q. Mr. Hudson, I hand to you a copy of a document. Do you recognize it? (The witness was proffered the document.) A. Yes, this is a copy of my work paper. Q. That was a work paper you prepared? A. Yes, it is. Q. And what does that work paper reflect? In terms of a computation for the accumulated depreciation [depletion]? Does that refresh your recollection as to how you computed it? A. Yes. Q. Wasn't the computation based on the estimated recoverable reserves of over filve [five] million tons of coal? A. Yes, it was. Q. So for purposes of cost depletion, you estimated that approximately one-third of the royalties with respect to this property had been received? (Pause.) In the year 1977? A. That's -- apparently we based it on the tons represented by the entire advance royalty. Q. That's correct. The amount of the depletion was based on the cash received in 1977, for the year ended 1/31/77. Is that right? A. I believe that is correct. Q. And on that basis, the basis for such a computation would be that that represented approximately one-third of the royalties that would be received under that sublease? A. Well, that's the portion that we wrote off as an expense. Q. On the theory that approximately -- that represented payment of royalties for approximately one-third of the recoverable tons, is that correct? A. It -- I don't recall the exact rationale for what -- how we arrived at this, but it does come out to about one-third of the cost. Q. Well -- A. It was based on the tons represented by the advance royalty, yes. Q. And it would follow then that there remained a reserve of approximately two-thirds of the cost of those leases which would be written off against future royalties. Isn't that what's implicit in this computation? A. I presume that's correct, yes. Q. As of 1/31/77, there remained two-thirds of the cost of the leases which would be written off against future royalties. Is that the basis for the computation? A. Yes. ↩
12. The stipulation of facts states that the amount deducted for wages was $ 3,550. The underlying tax return, admitted into evidence as a joint exhibit, shows the amount of $ 3,350. We think this was just a typographical error on the part of the parties. We may disregard stipulations between parties if the evidence contrary to the stipulation is substantial or the stipulation is clearly contrary to facts disclosed by the record. Loftin and Woodard, Inc. v. United States,577 F.2d 1206, 1232 (5th Cir. 1978); Jasionowski v. Commissioner,66 T.C. 312, 317-318↩ (1976).
13. On brief, respondent conceded that this method of amortizing the $ 534,753 of expenditures over a period of 18.63 years was improper. Instead, respondent now contends that the expenditures constitute additions to Wolfe Corporation's adjusted depletion basis as used in section 631(c). We do not find this change of theory by respondent to have surprised or prejudiced petitioners, and petitioners do not contend otherwise. See Nat Harrison Associates, Inc. v. Commissioner,42 T.C. 601, 617↩ (1964). 14. We note, however, that we would reach the same result on this issue if we were to apply the "strong proof" rule. Indeed, on the facts of this case, we would reach the same result even under the ordinary preponderance of the evidence standard of proof. We note also that the present case is not a situation of an ambiguous contract to which neither this Court nor the Sixth Circuit would apply the Danielson rule ( Patterson v. Commissioner,810 F.2d 562, 572 (6th Cir. 1987), affg. T.C. Memo. 1985-53↩), but an attempt to vary the clear terms of the parties' agreement. 15. During the trial and in their briefs, petitioners repeatedly argued that respondent has taken inconsistent positions with respect to the sublease as between petitioners and Wolfe Corporation, on the one hand, and the Campton partnership and its partners, on the other hand. Petitioners referred to respondent's determinations with respect to Campton and its partners that there were no substantial coal reserves under the Wolfe County property. However, this case does not involve the deficiency determinations against any of the Campton partners. Thus, petitioners' claim that this is a "whipsaw" case is not supported by the record. At best the record merely shows that respondent has settled with most, but not all, of the Campton limited partners on the basis of their cash out-of-pocket investment in the coal tax shelter. Even the other Campton limited partners have no right to rely upon or to try to compel respondent to offer them the same settlement terms. See Avers v. Commissioner,T.C. Memo. 1988-176↩. Thus, whatever the terms of those settlements, they can afford petitioners no comfort in this case. 16. Section 631(c) provides: (c) Disposal of Coal or Domestic Iron Ore With a Retained Economic Interest. -- In the case of the disposal of coal (including lignite), or iron ore mined in the United States, held for more than 6 months before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal or iron ore, the difference between the amount realized from the disposal of such coal or iron ore and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal or iron ore. This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal or iron ore, and the word "owner" means any person who owns an economic interest in coal or iron ore in place, including a sublessor. The date of disposal of such coal or iron ore shall be deemed to be the date such coal or iron ore is mined. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. This subsection shall have no application, for purposes of applying subchapter G, relating to corporations used to avoid income tax on shareholders (including the determinations of the amount of the deductions under section 535(b)(6) or section 545(b)(5). This subsection shall not apply to any disposal of iron ore -- (1) to a person whose relationship to the person disposing of such iron ore would result in the disallowance of losses under section 267 or 707(b), or (2) to a person owned or controlled directly or indirectly by the same interests which own or control the person disposing of such iron ore.
As used in section 631(c), "owner" means any person who owns an economic interest in coal in place, including a sublessor. Sec. 631(c). A lessee who is also a sublessor may dispose of coal as an "owner" under section 631(c). Sec. 1.631-3(b)(3)(ii), Income Tax Regs. For an exhaustive analysis of these interrelated provisions, see Davis v. Commissioner,74 T.C. 881 (1980), affd. 746 F.2d 357↩ (6th Cir. 1984). 17. Sec. 1231(b)(2) provides: (2) Timber, Coal, or Domestic Iron Ore. -- Such term ["property used in the trade or business"] includes timber, coal, and iron ore with respect to which section 631 applies. ↩
18. Section 272 provides: SEC. 272. DISPOSAL OF COAL OR DOMESTIC IRON ORE.
Where the disposal of coal or iron ore is covered by section 631, no deduction shall be allowed for expenditures attributable to the making and administering of the contract under which such disposition occurs and to the preservation of the economic interest retained under such contract, except that if in any taxable year such expenditures plus the adjusted depletion basis of the coal or iron ore disposed of in such taxable year exceed the amount realized under such contract, such excess, to the extent not availed of as a reduction of gain under section 1231, shall be a loss deductible under section 165(a). This section shall not apply to any taxable year during which there is no income under the contract. ↩
19. Sec. 1.272-1(d)(1), Income Tax Regs., lists the following items as examples of expenditures referred to in section 272: ad valorem taxes imposed by state or local authorities, costs of fire protection, costs of insurance (other than liability insurance), costs incurred in administering the contract (including costs of bookkeeping and technical supervision), interests on loans, expenses of flood control, legal and technical expenses, and expenses of measuring and checking quantities of coal or iron ore disposed of under the contract. Sec. 1.272-1(d)(1), Income Tax Regs.↩
20. Petitioners cite Rev. Rul. 75-306, 1975-2 C.B. 243; Rev. Rul. 71-334, 1971-2 C.B. 248; and Rev. Rul. 58-266, 1958-1 C.B.520. Petitioners also ask us to see Johnson v. Commissioner,7 T.C. 465 (1946), affd. in part and revd. in part 162 F.2d 844 (5th Cir. 1947), and Giffin v. Commissioner,19 B.T.A. 1243↩ (1930). 21. The total $ 534,753 in capital expenditures wsa disallowed by respondent by decreasing the basis for section 631(c) gain by $ 526,476 and by decreasing ordinary deductions by $ 8,277. The $ 526,476 amount thus constitutes additions to Wolfe Corporation's depletable basis under section 1016(a)(1).↩
22. Respondent's brief state the formula as:
Section 612 depletable cost basis
x
Advance Royalty
Advance and estimated furture royalty
This gives the same result as the formula in the text above. See n.26, infra↩.
23. Sec. 1.611-2(c)(1), Income Tax Regs., provides as follows: (c) Determination of mineral contents of deposits. (1) If it is necessary to estimate or determine with respect to any mineral deposit as of any specific date the total recoverable units (tons, pounds, ounces, barrels, thousands of cubic feet, or other measure) of mineral products reasonably known, or on good evidence believed, to have existed in place as of that date, the estimate or determination must be made according to the method current in the industry and in the light of the most accurate and reliable information obtainable. In the selection of a unit of estimate, preference shall be given to the principal unit (or units) paid for in the product marketed. The estimate of the recoverable units of the mineral products in the deposit for the purposes of valuation and depletion shall include as to both quantity and grade: (i) The ores and minerals "insight", "blocked out", and "developed", or "assured", in the usual or conventional meaning of these terms with respect to the type of the deposits, and (ii) "Probable" or "prospective" ores or minerals (in the corresponding sense), that is, ores or minerals that are believed to exist on the basis of good evidence although not actually known to occur on the basis of existing development. Such "probable" or "prospective" ores of minerals may be estimated: (a) As to quantity, only in case they are extensions of known deposits or are new bodies or masses whose existence is indicated by geological surveys or other evidence to a high degree of probability, and (b) As to grade, only in accordance with the best indications available as to richness. ↩
24. Respondent's argument appears to be that since this engineering report provides the only evidence of tonnage figures and since petitioners purportedly relied upon that engineering report in some way in the tax shelter deal, the Court should hold petitioners to be that figure even if it is unreasonable. We think there is a better foundation on which the Court can rest its determination of petitioners' adjusted depletion basis. ↩
25. The royalties that were received under the sublease were: Taxable year ending January 31, 1977
$ 2,523,529
Taxable year ending January 31, 1978
231,805
Taxable year ending January 31, 1979
128,358
Our determination is somewhat in the nature of an approximation under the Cohan rule, and grows out of our conclusion that use of the engineering report tonnage figures could be wholly unreasonable and would result in an unduly harsh result inthis case. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). However, bearing heavily against petitioners for their failure to develop an adequate factual record on the matter, we decline to fine-tune these figures for any payments of overriding royalties to landowners or other possible adjustments. Compare n.21, supra. Petitioners essentially ask the Court to use net royalty figures, but we feel that is unduly generous and approaches sheer "unguided largesse." Williams v. United States,245 F.2d 559, 560↩ (5th Cir. 1957). 26. Accordingly, Wolfe Corporation's adjusted depletion basis is $ 461,594, computed as follows: Respondent's Formula
$ 526,476 /
x
$ 2,484,472
=
$ 461,593.88
$ 2,833,692
Formula in Text Above
$ 2,484,472 /
x
$ 526,476
=
$ 461,593.88
$ 2,833,692
Wolfe Corporation's section 272 adjustment is $ 4,700, and the resulting section 631(c) capital gain is $ 2,018,178 computed as follows: $ 2,484,472 -
$ 461,594 -
$ 4,700 =
$ 2,018,178
(amount
(adjusted
(sec.
realized
depletion
272
under sec.
basis
items)
631c)
This computation is without regard to the other $ 65,111 costs that respondent did not disallow (see n.10, supra↩), which the parties can take into accounting their Rule 155 computations.