G C SERVICES CORP., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11193–76.     Filed December 3, 1979.

*Charles W. Hall, Kenneth W. Gideon,* and *Gerald W. Haddock,* for the petitioners.
*Daniel A. Taylor, Jr.,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined a deficiency of $168,000 in the petitioner's Federal income tax for 1972. The petitioner subsequently claimed an overpayment of $93,848 for the same year. The issues for decision are: (1) What portion, if any, of the payment which the petitioner made to purchase shares of its own stock and to settle claims of the seller of such stock is allocable to the settlement of such claims, and (2) if a portion is so allocable, whether it can be deducted as an ordinary and necessary business expense under section 162(a) of the Internal Revenue Code of 1954.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, G C Services Corp., maintained its principal office at Houston, Tex., when it filed its petition in this case. It filed its Federal income tax return on the basis of a taxable year ending on September 30, and we shall identify each taxable year by the calendar year in which it ends. It filed its Federal corporate income tax return for its 1972 taxable year with the Internal Revenue Service Center, Austin, Tex.

The petitioner, which is a Texas corporation and which was formerly known as Gulf Coast Collection Agency Co., is engaged in the business of collecting delinquent accounts for many large U.S. corporations, including most of the major oil companies. To modernize its collection systems and procedures and improve its profitability, the petitioner hired Ely M. Zalta as its president on February 13, 1967. There was no written employment contract.

The petitioner customarily allowed its new officers to buy stock in the corporation. Hence, upon joining the petitioner, Mr. Zalta was permitted to purchase 25 of 100 shares of the petitioner's stock then issued and outstanding. From June 1967 through September 1968, he purchased such stock in four separate transactions for an aggregate price of $16,762.20. The sales prices in the several transactions were either equal to book value or were established by negotiations at less than book value.

On November 28, 1967, Mr. Zalta, Jerold B. Katz (Mr. Katz), Larry I. Fradkin, and Martin M. Katz, who were the officers and sole shareholders of the petitioner at the time, entered into a stock purchase agreement which gave the petitioner an option to purchase the stock of any shareholder upon the termination of the shareholder's employment with the petitioner. In early 1969, the petitioner terminated Mr. Zalta's employment; and in reliance on the stock purchase agreement, the petitioner, on March 25, 1969, exercised its option to purchase Mr. Zalta's stock for a price of $111,730.50. However, Mr. Zalta rejected the offer, contending that under the stock purchase agreement he was entitled to a higher price for his stock.

By September 15, 1969, the dispute between the petitioner and Mr. Zalta was still not settled; accordingly, on that day, he commenced the first civil action against the petitioner in the

District Court of Harris County, Tex. In that action, there were three principal prayers for relief. In one of the principal prayers (the first prayer), he sought to recover $1,530,000 or, alternatively, $1 million for his stock in the petitioner. He believed that if the petitioner exercised its option, he was entitled either to the full value of his stock, which he considered to be $1,530,000, or at least to the amount which he had been offered for it by certain outside investors, $1 million. However, in November 1969, he and the petitioner agreed that the attempted exercise of the option was no longer effective.

In another of the principal prayers (the second prayer) of the first civil action, Mr. Zalta sought to enjoin the petitioner and its officers, directors, and managing agents from taking certain actions which might adversely affect the value of his stock or his interest in the corporation. Mr. Zalta feared that the petitioner would be able to obtain his stock certificate from the Texas National Bank of Commerce of Houston, where it was being held pursuant to the stock purchase agreement. His request for a temporary restraining order (the restraining order) with respect to the second prayer was granted on September 18, 1969. Among other provisions, such order enjoined the petitioner from authorizing or issuing any new shares which would dilute the percentage or value of Mr. Zalta's ownership, from effecting any merger or acquisition, from diverting any of the earnings of the petitioner to any other person or from otherwise disposing of Mr. Zalta's shares in any manner or form, and from making any changes in the capitalization of the petitioner or any of its wholly owned subsidiaries. Such order remained in effect until the settlement between Mr. Zalta and the petitioner in 1972.

In another of the principal prayers (the third prayer) of the first civil action, Mr. Zalta sought to recover 44 percent of the increase in retained earnings of the petitioner during the period of his employment. According to his computation, he was entitled to $176,000 plus interest, but had he prevailed, he would actually have been entitled only to approximately $172,000 including interest. Mr. Zalta's counsel considered such claim to have little merit.

In 1970, Mr. Zalta commenced the second civil action against the petitioner in the District Court of Harris County, Tex., in which he sought a writ of mandamus (the mandamus action). The court entered judgment against the petitioner and directed

it to furnish to Mr. Zalta (1) monthly profit and loss statements for the petitioner and National Credit Control Inc. (NCCI) (a related inactive company in which Mr. Zalta owned a small amount of stock) from October 1, 1969, forward; (2) a monthly breakdown of expenses for the petitioner and NCCI for the same period set forth in the following categories: compensation to officers and directors, compensation to other employees, ordinary and usual overhead, and special overhead expenses; and (3) access to all stock books and minutes books of all meetings of shareholders and boards of directors of the petitioner and NCCI. Mr. Zalta was the sole nonemployee stockholder of the petitioner, and he commenced the mandamus action to obtain such information in order to protect his interest in the petitioner. Such order remained in effect until the settlement in 1972.

Later in 1970, Mr. Zalta commenced a third civil action against the petitioner in the District Court of Harris County, Tex., in which he requested an injunction against the adoption of an employee stock option plan by the petitioner (the stock option action). The court issued a temporary restraining order directing the petitioner not to adopt any such plan pending the action. In January 1971, the case was tried before a jury, and the jury found, among other things, that on the day of the adoption of the stock option plan, the fair market value of the petitioner's stock was $133 per share and that the action of the board of directors of the petitioner in offering to sell such stock under such plan to the employees at a price of $32 was fraudulent.

Mr. Zalta never took judgment on his verdict; instead, he agreed with Mr. Katz to forbear taking judgment while Mr. Katz attempted to resolve their differences and end all the litigation by finding a buyer either for Mr. Zalta's stock or for the entire company. By that time, the petitioner had spent more than $75,000 in legal and accounting fees as a result of the litigation.

Mr. Katz did not find a buyer for Mr. Zalta's stock. However, in December 1971, Mr. Zalta did receive an offer from investors in Killeen, Tex., to purchase all his stock in the petitioner for $1,250,000. Initially, he rejected the offer, and when, in January 1972, he sought to have it renewed, the Killeen investors refused to extend the offer.

Shortly thereafter, Mr. Katz, on behalf of the petitioner, offered Mr. Zalta $1,300,000 for his stock. Mr. Zalta also rejected

such offer; whereupon, Mr. Katz increased the offer to $1,400,000, and Mr. Zalta accepted such offer. The agreement was subsequently reduced to writing (the settlement agreement) and was signed on May 8, 1972, by the parties thereto.

In part, the settlement agreement provided:

Zalta agrees to sell and Gulf Coast agrees to buy 9,624 shares of the common stock of Gulf Coast * * * and 250 shares of the common stock of * * * [NCCI], all of which are referred to hereinafter as the Stock, on the following terms and conditions:

(a) The purchase price for the Stock is One Million Four Hundred Thousand and no/100 Dollars ($1,400,000.00) * * *

*   *   *   *   *   *   *

(d) All parties hereto agree to execute at Closing a Mutual Release * * * [1]

It is stipulated that the value of Mr. Zalta's 250 shares of NCCI did not exceed $2,470. There were pending criminal indictments against the officers of the petitioner for allegedly using the mails with the intent to extort money and a Federal Trade Commission (FTC) complaint against the petitioner and its officers for allegedly engaging in unfair and deceptive acts and practices in commerce. The settlement agreement provided that the closing was to take place within 3 days after the entry of a consent order in the FTC action and a dismissal of the criminal indictments.

By September 1972, the FTC had accepted the consent order, and the criminal indictments had been dismissed. Thus, the parties closed the agreement on September 15, 1972 (the settlement). At settlement, the parties exchanged the money and the stock and signed the mutual release, Mr. Zalta agreeing specifically to move to dismiss the three legal actions which he had brought against the petitioner.

The settlement agreement was negotiated by Mr. Katz and counsel for Mr. Zalta. Mr. Katz would not have agreed to the settlement without inclusion of the provision for the release of the legal actions brought by Mr. Zalta. Yet, at no time during the negotiations, indeed not until well after the settlement, did the negotiators discuss the possibility of allocating any portion of the payment to the release of such legal actions.

After the execution of the settlement agreement but before

---

[1] A 401-to-1 stock split had increased Mr. Zalta's shares from 25 to 10,025, and a sale to one of the officers of the petitioner had reduced his shares to 9,624, or 24 percent of the shares outstanding.

the settlement, the officers of the petitioner discussed the allocation of a part of the payment to such release. The petitioner's treasurer prepared an analysis of all the transactions in the petitioner's stock and concluded that the value of the stock purchased from Mr. Zalta did not exceed $1,064,960 and that $335,040 of the payment was allocable to the release. The board of directors of the petitioner decided to allocate $350,000 to the release, and on its income tax return for 1972, the petitioner deducted that amount. In his notice of deficiency, the Commissioner disallowed the deduction.

## OPINION

This case presents two issues: first, whether, for tax purposes, the petitioner is entitled to treat a portion of its $1,400,000 remittance to Mr. Zalta as a payment for release of his legal actions; second, if a portion can be so allocated, whether it is deductible as an ordinary and necessary business expense under section 162. We will deal with the issues in order.

The petitioner contends that the settlement agreement makes no allocation of the $1,400,000 between the stock and the release of the legal actions and that the parties thereto had no agreement as to any such allocation. Accordingly, it urges us to make an allocation based on economic reality. In the alternative, the petitioner contends that even if the settlement agreement does reflect an allocation, the allocation is not the one intended by the parties and that we should make an allocation based on the actual intention of the parties. The Commissioner challenges both positions.

At the outset, it is clear that the settlement agreement did make an allocation of the $1,400,000 payment. In our findings of fact, we have set forth the pertinent provisions of that agreement, and they state unequivocally that the $1,400,000 was paid for the purchase of Mr. Zalta's stock. Although the agreement provides for the mutual release to be signed, no consideration is set forth for such release. In connection with agreements structured similarly, the courts have consistently found that such an agreement does make an allocation of the payment. See *Annabelle Candy Co. v. Commissioner*, 314 F.2d 1, 8 (9th Cir. 1962), affg. a Memorandum Opinion of this Court; *Yates Industries, Inc. v. Commissioner*, 58 T.C. 961, 972–973 (1972).

The petitioner argues that, notwithstanding the terms of the

settlement agreement, there was never an "agreed allocation." The petitioner bases its claim on the undisputed facts that the parties to the agreement never discussed an allocation before the settlement and that consequently there was never a meeting of the minds on the matter of an allocation. By establishing the lack of agreement, the petitioner seeks to fit its case within two decisions of this Court, *Kinney v. Commissioner,* 58 T.C. 1038 (1972), and *Eisler v. Commissioner,* 59 T.C. 634 (1973).

In *Kinney,* the seller, who was the petitioner, and the buyer of an insurance business generally made no allocation of the purchase price among the assets sold; in particular, they made no allocation to the covenant not to compete. We decided that the failure to make an "agreed allocation" to the covenant did not indicate that the seller and the buyer agreed that none of the price was allocable to the covenant; therefore, we made an allocation based on the economic substance of the transaction. (58 T.C. at 1043.) Similarly, in *Eisler,* we found that because a payment made by the taxpayer to secure release of various law suits filed against him was not allocated among the suits, we were justified in making an allocation ourselves. (59 T.C. at 640.) In *Kinney* and *Eisler,* we held that when the parties to an agreement fail to make an allocation, we will, of necessity, step in to make it for them in order to determine the tax consequences of the transaction. However, in this case, Mr. Zalta and the petitioner made an unambiguous allocation of the $1,400,000 to the stock. Thus, the petitioner's reliance on *Kinney* and *Eisler* is misplaced.

The petitioner argues, alternatively, that it should be permitted to prove that the allocation expressed in the settlement agreement did not reflect the intention of the parties. Under decisions of this Court and of the Fifth Circuit, to which an appeal would lie in this case, the petitioner may offer evidence in an attempt to do so. However, under those cases, the petitioner must establish by "strong proof"[2] that the terms of the written instrument did not reflect the actual intention of the parties thereto. *Balthrope v. Commissioner,* 356 F.2d 28 (5th Cir. 1966), affg. a Memorandum Opinion of this Court; *Lucas v. Commissioner,* 58 T.C. 1022 (1972).

---

[2]The Commissioner once again urges us to adopt the stricter rule of *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967). As many times before, we decline to do so. See, e.g., *Baldarelli v. Commissioner,* 61 T.C. 44 (1973).

The petitioner and the Commissioner disagree over what the petitioner must prove. The Commissioner maintains that the petitioner must show that the parties to the agreement had actually reached agreement on an allocation and that the written agreement did not reflect their actual agreement. On the other hand, the petitioner contends that it must show merely that the parties to the agreement recognized that a portion of the payment was allocable to the release of the legal actions. We need not resolve this dispute, for we are satisfied that in any event, the petitioner has failed to carry its burden.

In our findings of fact, we found that prior to the execution of the settlement agreement, and even prior to the actual settlement, there was no discussion between the parties thereto of any allocation of any part of the payment to the release of the legal actions. Thus, there is no basis for finding that Mr. Zalta actually agreed to allocate some part of the payment to the release. In fact, since the settlement agreement expressly allocated the entire payment to the purchase of his stock, and since there was no discussion between him and Mr. Katz of any other allocation of such payment, Mr. Zalta could reasonably believe that the parties had agreed to the allocation set forth in the settlement agreement. See *Annabelle Candy Co. v. Commissioner, supra* at 7.

Moreover, even if we look to the underlying economic realities of the transaction, we are not convinced that the parties thereto recognized that any part of the payment was made for the release of the legal actions brought by Mr. Zalta. Initially, we are not satisfied that such legal actions were as burdensome as claimed by the petitioner.

The third prayer of the first civil action, relating to retained earnings, did survive until the settlement. In connection with the claim, the petitioner points out that Mr. Zalta's counsel felt that the claim, although not "winnable," could withstand a motion for summary judgment. However, the counsel's complete statement was:

My opinion was that it could withstand a motion for summary judgment by the other side. That standing alone, it was not worth filing. And that it was not a winnable suit standing alone.

\* \* \* \* \* \* \*

the other side [the petitioner] had snickered about that claim from the time it

was filed. I think it would have been a little inconsistent for them to say it was worth something in settlement. And they did not * * *

The petitioner produced no evidence to contradict such testimony, and in view of that testimony, we are not persuaded that the claim for retained earnings had any substantial value.

In connection with the restraining order issued as a result of the first civil action and the order issued under the mandamus action, Mr. Katz testified that he understood the restraining order prevented the corporation from participating in mergers or recapitalizations, that he feared that Mr. Zalta would characterize any new venture that turned sour as a diversion of earnings in violation of the order, that the information furnished Mr. Zalta allowed him to "second guess" decisions of management, that as a result, the petitioner passed up at least two business opportunities, and that about 40 percent of the time of the officers of the petitioner was required to deal with Mr. Zalta and his various claims. However, the evidence submitted by the petitioner does not support the testimony of Mr. Katz. The petitioner produced no evidence showing that it did in fact contemplate any new ventures which had to be abandoned because of Mr. Zalta's legal actions, nor did it produce any detailed evidence as to the time required by the officers to respond to Mr. Zalta's actions. Indeed, Mr. Katz admitted that the information furnished Mr. Zalta was nothing more than what the law required be furnished to a shareholder. If those court orders were burdensome for the petitioner, it failed to establish such burdens in this record.

In like manner, the petitioner has failed to establish that the restraining order issued as a result of the stock option action was a serious burden for the petitioner. Mr. Katz claimed that he was required to spend substantial time explaining to the employees why they were not receiving stock options, but the record does not substantiate his claim. There is no detailed information as to why it required substantial time to explain such fact to the employees. Furthermore, before 1970, the stock of the petitioner was closely held, and we are not told how many employees would be allowed to participate in the option plan. The mere claim by Mr. Katz does not persuade us that the stock option action imposed a real burden on the petitioner.

The petitioner specifies two additional problems which it claims resulted from Mr. Zalta's legal actions. First, it states

that it incurred legal and accounting expenses of $75,000 as a result of the litigation. Second, Mr. Katz claims that he feared that the finding of fraud by the jury in the stock option action would make it more difficult for the petitioner to prevail in the criminal actions and the FTC action. We recognize that the litigation was expensive; yet, there was no indication of just how the fraud finding would affect the petitioner's position in those other actions.

We accept the fact that the petitioner found Mr. Zalta's legal actions to be irksome and that it very much desired to put an end to such actions. Nevertheless, we are not persuaded that in substance, it ever contemplated anything more than a purchase of his stock. While Mr. Zalta was still a stockholder of the petitioner, he and the other stockholders entered into an agreement providing that each of them would sell his stock back to the corporation if his employment was terminated. Such agreement shows that the stockholders of the petitioner did not wish to have stock held by anyone who was not working for the corporation. Even before Mr. Zalta commenced his legal actions, the petitioner attempted to repurchase his stock. Although the efforts to do so were suspended for a time, Mr. Katz attempted to find a buyer for the stock after Mr. Zalta secured the favorable verdict in the stock option action. At that time, Mr. Katz became particularly anxious to put an end to the litigation, and his way of doing so was to find a buyer for Mr. Zalta's stock. He apparently recognized that most of Mr. Zalta's legal actions arose out of his ownership of the stock and that if his stock were sold, his legal actions would come to an end.

When Mr. Katz was unable to find another buyer for the stock, he then proposed to have the petitioner purchase it. In the light of his obvious belief that if Mr. Zalta sold his stock his legal actions would be terminated, it is not at all surprising that in negotiating the settlement agreement with Mr. Zalta, nothing was said about any payment for the release of the legal actions. The release was included in the settlement agreement, but in the words of Mr. Zalta's counsel, it was "a housekeeping matter, in my opinion." There is certainly no reason to believe that Mr. Zalta considered any portion of the payment as allocable to the release: the agreement stated that it was for the purchase of the stock, and nothing was ever said between the parties to the agreement to indicate otherwise. It appears that the possibility

of allocating some of the payment to the release was merely an afterthought that arose when Mr. Katz discussed the matter with the other officers of the petitioner.

In conclusion, on this record, we must hold that the petitioner has failed to carry its burden of showing by strong proof that the parties to the settlement agreement had an intention different from that set forth in the agreement; accordingly, we conclude that the entire payment of $1,400,000 is allocable to the purchase of Mr. Zalta's stock. In view of that conclusion, we need not decide whether any part of the payment allocable to the release would be deductible under section 162.

*Decision will be entered for the respondent.*