T.C. Memo. 1999-126


UNITED STATES TAX COURT


FRED J. PETTID, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3716-97.                    Filed April 16, 1999.


<u>James R. Brown</u> and <u>Thomas R. Brown</u>, for petitioner.

<u>Henry N. Carriger</u> and <u>Albert B. Kerkhove</u>, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following
deficiencies in petitioner's Federal income tax for the
years in issue:

| Year | Deficiency |
|------|------------|
| 1993 | $19,578 |
| 1994 | 18,964 |
| 1995 | 19,578 |

After concessions, the sole issue for decision is whether monthly payments that petitioner made to Ms. Inga Wagner during the years in issue are properly treated as alimony and deductible under section 215(a) of the Internal Revenue Code, as petitioner contends, or as nondeductible payments in settlement of a claim for damages, as determined by respondent. Unless stated otherwise, all section references in this opinion are to the Internal Revenue Code in effect for the years in issue. Ms. Wagner was formerly known as Inga Wagner Bartling, and in various documents constituting the record of this case, Ms. Wagner is sometimes referred to as Ms. Bartling.

FINDINGS OF FACT

This case was submitted fully stipulated pursuant to Rule 122 of the Tax Court Rules of Practice and Procedure. All Rule references in this opinion are to the Tax Court Rules of Practice and Procedure. The stipulation of facts, supplement to stipulation of facts, and the attached exhibits are incorporated herein by this reference. Petitioner resided in Omaha, Nebraska, at the time he filed his petition in this case.

Petitioner married his first wife, Ms. Wilma Rae Pettid, on October 20, 1962. Slightly more than 19 years later, on March 12, 1982, the District Court of Douglas County, Nebraska (herein referred to as the district court), entered a decree dissolving this marriage.

On or about May 5, 1982, petitioner obtained a license from the district court to marry Ms. Wagner. Petitioner and Ms. Wagner were purportedly married in a solemnization ceremony conducted on May 8, 1982, less than 2 months after the decree dissolving petitioner's marriage to his first wife. Nebraska law provides that "a decree dissolving a marriage shall become final and operative * * * six months after the decree is rendered". Neb. Rev. Stat. sec. 42-372 (1988). Thus, at the time petitioner and Ms. Wagner were purportedly married, the decree dissolving petitioner's marriage to his first wife had not yet become final.

Approximately 9½ years later, on or about January 14, 1992, petitioner filed a petition for declaratory judgment in the district court seeking to have his putative marriage to Ms. Wagner declared void. The petition identifies petitioner as plaintiff and Ms. Wagner as defendant. The petition alleges in pertinent part as follows:

> 3. On March 12, 1982, the marriage of Plaintiff, Frederick J. Pettid to Wilma Rae Pettid was decreed dissolved by the a [sic]

Decree of the District Court of Douglas County, Nebraska, at Doc. 777, No. 168.

4. On May 5 [sic], 1982, Plaintiff and Defendant were purportedly married in the city of Omaha, County of Douglas, Nebraska.

5. Pursuant to applicable Nebraska statutes, Plaintiff, Frederick J. Pettid was under absolute disability to marry the Defendant on May 5 [sic], 1982.

6. On or about January 13, 1992, in contemplation of instituting an action for dissolution of the above-noted alleged marriage, Defendant removed from a joint banking account of the parties $50,000, all of which was earned by, and belonged to, the Plaintiff herein.

7. Defendant made no contribution to said monies which she has now taken and whose whereabouts are not known to Plaintiff.

The petition requests the following relief from the court: To declare the purported marriage between petitioner and Ms. Wagner void; to determine that the $50,000 removed by Ms. Wagner, as alleged in paragraph 6 of the above-quoted petition, is the property of petitioner; to determine that Nebraska divorce law does not apply to this action; and to determine that petitioner and Ms. Wagner each be entitled to the property that he or she personally accumulated during the purported marriage. The declaratory judgment action, including amendments thereto described below, is referred to herein as the annulment proceeding.

On April 20, 1992, Ms. Wagner filed a petition against petitioner in the district court.  Ms. Wagner's petition alleges in pertinent part as follows:

> 3.    During the years 1981 and 1982, Pettid dated and courted Bartling [viz, Wagner].
>
> 4.    During the courtship, Bartling was a single person, having been legally divorced from a previous marriage.
>
> 5.    At all times during the courtship, Pettid represented himself to Bartling as a single person, who had been divorced pursuant to a dissolution of a previous marriage.
>
> 6.    During the courtship, Pettid established himself in a position of trust and confidence with Bartling which resulted from the courtship relationship.
>
> 7.    In or around August, 1981, Pettid asked Bartling to marry him, promising to marry her and cohabitate as husband and wife.
>
> 8.    Bartling accepted the good faith of Pettid and relied upon his representation to her that he was legally capable of entering into an agreement to marry her.  Bartling, therefore having reasonably and justifiably given Pettid her trust and confidence, and accepting his good faith, agreed to marry Pettid pursuant to his proposal.
>
> 9.    In anticipation of her planned marriage to Pettid, and with Pettid's knowledge and encouragement, Bartling resigned her employment in the Fall of 1981.
>
> 10.    In anticipation of her planned marriage to Pettid, and with Pettid's knowledge and agreement, Bartling sold her residence in the Fall of 1981 and moved into her parents' house, planning to remain a resident there until the marriage was solemnized.

11. In anticipation of her planned marriage to Pettid, and at Pettid's specific request, Bartling gave funds to Pettid for business purposes, including his purchase of his medical practice and the purchase of certain real estate.

12. Throughout the entire courtship and until March 12, 1982, Pettid knew that he was not legally divorced from his first wife, Wilma Pettid. Pettid knowingly and intentionally concealed his true marital status from Bartling throughout their courtship and continued to conceal until January 14, 1992.

13. On March 12, 1982, Pettid was decreed divorced from his first wife, Wilma, by the District Court of Douglas County, Nebraska. The decree was not effective for six months from its date. Pettid knowingly and intentionally concealed this fact from Bartling from the date of the decree until January 14, 1992.

14. On or about May 5, 1982, Pettid and Bartling made application to the Douglas County Clerk for a marriage license. Pettid knowingly and falsely stated the date of his divorce decree as February 16, 1981. Bartling made application for such marriage license in good faith, based on her reliance on Pettid's affirmative statements that Pettid was legally capable of entering into the proposed marriage.

15. On May 8, 1982, knowing himself to be under a legal prohibition from entering into a marriage, Pettid arranged a marriage ceremony in which Pettid and Bartling exchanged marriage vows in Douglas County, Nebraska * * *.

16. Bartling participated in the solemnization ceremony and the reception without knowledge that Pettid's divorce was not final and without knowledge that Pettid was not legally capable of entering into a valid marriage. Bartling accepted Pettid's good faith and representations concerning his marital status in entering into and participating in the marriage ceremony with Pettid, and thereafter relied on the legitimacy of the marriage ceremony.

17.   Subsequent to May 8, 1982, and as a result of Pettid's fraudulent representations to Bartling that they were legally married and the purported marriage between Bartling and Pettid, Bartling was induced to live with Pettid as his wife.

18.   In reliance on the validity of the marriage and by reason of Pettid's fraudulent misrepresentations to Bartling that they were legally married, Bartling undertook certain actions, including, but not limited to the following:

a.   Bartling assumed Pettid's last name * * *;

b.   Bartling changed her status from that of a single person to a married woman, thereby being required to live meretriciously with Pettid;

c.   Bartling filed federal and state income tax returns as the spouse of Frederick J. Pettid for the years 1982 through 1990;

d.   Bartling performed normal duties as Pettid's spouse, including housekeeping, cooking, laundry, tending to family activities, being active in civic and social groups as Pettid's wife;

e.   Bartling assisted in Pettid's medical practice development activities by being active in the medical community's social and charitable activities and assisting in the introduction of Pettid to other members of the medical profession, all of which assisted Pettid in the development of his medical practice;

f.   Bartling forsook her career in order to tend to her responsibilities as Pettid's wife;

g.   Bartling held herself out as a married woman * * *.

h.   By virtue of holding herself out as a married woman, Bartling thereby lost certain inheritances from her parents she would have had if she had been a single person at the time of their deaths.

Based upon the above allegations, Ms. Wagner's petition sets forth four separate grounds for relief:  (1) Intentional infliction of emotional distress; (2) fraud and deceit and misrepresentation of capacity to marry; (3) breach of promise to marry; and (4) quantum meruit.  The action instituted by Ms. Wagner is referred to herein as the Bartling lawsuit.

On March 6, 1992, petitioner amended his declaratory judgment action into a petition for annulment of marriage. On or about April 27, 1992, petitioner filed a second amended petition for annulment of marriage (Domestic Law). The prayer for relief of the amended petition states as follows:

WHEREFORE, Petitioner prays that the Court decree that the marriage of the parties be null and void; that each party should receive all property, whether real or personal, and moneys, securities and other valuable items of all types that each party personally accumulated during the period since May 5 [sic], 1982; and for such other and further relief that the Court may deem just and proper.

On November 19, 1992, petitioner and Ms. Wagner executed a Settlement Agreement and Mutual Release (the Annulment Agreement).  This agreement provides in pertinent part as follows:

### RECITALS

WHEREAS, on the 12th day of March, 1982, Pettid [i.e. Petitioner] was divorced pursuant to a Decree of Dissolution entered in the District Court of Douglas County, Nebraska, in a matter entitled <u>Wilma Rae Pettid, Petitioner vs. Frederick J. Pettid, Respondent</u> (hereinafter referred to as "the Divorce"), contained at Docket 777, No. 168; and

WHEREAS, on the 8th day of May, 1982, Pettid entered into a marriage ceremony with Wagner (hereinafter referred to as "the Marriage Ceremony"); and

WHEREAS, the Marriage Ceremony took place during the six-month interlocutory period of the Divorce; and

WHEREAS, Wagner was unaware of Pettid's legal inability to enter into a valid marriage and is an innocent party as otherwise referred to in Neb. Rev. Stat. § 42-378 (Reissue 1988); and

WHEREAS, Pettid filed a Petition for Declaratory Judgment which was amended to a Petition for Annulment of Marriage in a legal pleading entitled <u>Frederick J. Pettid, Plaintiff, vs. Inga W. Bartling, a/k/a Inga W. Pettid</u>, contained at Docket 903, Page 208, in the District Court of Douglas County, Nebraska (hereinafter referred to as "the Annulment Lawsuit"); and

WHEREAS, Wagner has filed a civil suit for deceit, fraud, breach of contract and quantum meruit against Pettid in an action entitled <u>Inga Bartling Pettid, Plaintiff, vs. Frederick</u>

<u>J. Pettid, Defendant</u>, in the District Court of Douglas County, Nebraska, at Docket 905, No. 797 (hereinafter referred to as "the Bartling Lawsuit"); and

WHEREAS, the parties desire to resolve all differences pertaining to the Annulment Lawsuit and the Bartling Lawsuit between themselves.

NOW, THEREFORE, in consideration of the above and foregoing, the parties agree as follows:

1.  <u>Payment from Pettid to Wagner</u>.  Pettid agrees to transfer real and personal property and to pay Wagner, as full and complete settlement toward the claims in the Annulment Lawsuit and the Bartling Lawsuit, as follows:

   a)  <u>Real Estate Commonly Known As 972 South 4th Street</u>.  * * *

     *    *    *    *    *    *    *

   b)  <u>IRA</u>.  * * *

   c)  <u>Household Goods</u>.  * * *

   d)  <u>Dean Witter</u>.  * * *

   e)  <u>Insurance</u>.  * * *

     *    *    *    *    *    *    *

   f)  <u>Periodic Support Payments</u>.  Commencing on December 1, 1992, and continuing on the first (1st) day of each and every month thereafter, Pettid shall pay Wagner periodic support payments of Four Thousand and No/100 Dollars ($4,000.00) per month for a period of eighty-four (84) months.

   g)  <u>House Account</u>.  * * *

     *    *    *    *    *    *    *

i)  <u>Cash Payment</u>.  * * *

* * * * * * *

5.  <u>Release</u>.  Wagner, in consideration of the compromise and settlement of her claim against Pettid, releases and forever discharges Pettid, his successors, legal representatives and assigns from all claims, demands and causes of action, including any arising in tort or contract, law or equity, that Wagner may now have or that might subsequently accrue to Wagner, known or unknown, arising out of or connected with, directly or indirectly, the marriage of the parties which took place on May 8, 1982, in any way connected with the relationship of the parties.  This release includes, but is not limited to, all claims and actions based on the allegations contained in the Bartling Lawsuit and the claims of an innocent spouse in the Annulment Lawsuit.  This release shall forever settle, adjust and discharge all claims of Wagner against Pettid pertaining to the Bartling Lawsuit or the Annulment Lawsuit.

Pettid, in consideration of the compromise and settlement of any claims he may have against Wagner, releases and forever discharges Wagner, her successors, legal representatives and assigns from all claims, demands and causes of action, including any arising in tort or contract, law or equity, known or unknown, that Pettid may now have or might subsequently accrue to Pettid arising out of or in any way associated therewith.  This release shall forever settle, adjust and discharge any claims that Pettid may have against Wagner by virtue of said marriage and all elements relating thereto.

* * * * * * *

9.  <u>Full Agreement</u>.  This agreement represents the complete understanding of the parties and constitutes a full and final settlement of all claims or claims against the other, known or unknown, without any reservation of any rights, either in law, equity, tort, contract, or in any

other fashion, and may not be modified except in writing and signed by all of the parties.

     10. <u>Binding Agreement</u>. This agreement shall be binding upon the parties, their respective heirs, successors, administrators, assigns and personal representatives.

    \*     \*     \*     \*     \*     \*     \*

     13. <u>Waiver of Breach</u>. No waiver of any breach by either party of the terms of this Agreement shall be deemed a waiver of any subsequent breach. No modification of this Agreement shall be binding upon either of the parties unless reduced to writing and subscribed by both parties, unless ordered by the Court.

The payments at issue in this case are the monthly payments made pursuant to paragraph 1.f) above.

On the same day that the Annulment Agreement was executed, the district court entered a decree which annulled petitioner's marriage to Ms. Wagner. The district court found that petitioner was legally married to Ms. Wilma Rae Pettid at the time of his marriage to Ms. Wagner; therefore, the marriage of petitioner and Ms. Wagner was void as a matter of law. The district court stated that it had examined the Annulment Agreement and

    finds the same to be fair, just, reasonable and not unconscionable and hereby approves the same, which Agreement is not being filed with the Court, but shall be adhered to by all parties as though said \* \* \* Agreement \* \* \* were filed with the Court and set forth in its entirety in this Agreement; that in the event either party shall fail to abide by the terms of the \* \* \* Agreement

* * *, the aggrieved party may file said Agreement with the Court and be entitled to all relief which would otherwise be made available for the enforcement of a judgment, including contempt.

The district court further stated:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that * * * [petitioner] and * * * [Ms. Wagner] shall each abide by and adhere to the terms and conditions of the  * * * [Annulment] Agreement which has been reviewed by the Court and has been found to be fair, just, reasonable and not unconscionable, and which Agreement shall not be filed with the Court as provided for in Neb. Rev. Stat. sec. 42-366(4)(b) (Reissue 1988).

Respondent issued a notice of deficiency to petitioner with respect to his 1993, 1994, and 1995 returns.  The notice of deficiency sets forth the following explanation for the adjustment disallowing the deduction petitioner claimed for the payments made during 1993:

Alimony Deduction:

Payments totaling $48,000.00 which you made in the taxable year 1993 to Inga Wagner, are not alimony payments, but are payments in settlement of a claim for damages.  Accordingly, the payments are not deductible and your taxable income is increased $48,000.00.

The notice of deficiency contains identical explanations for taxable years 1994 and 1995.

OPINION

The issue for decision is whether monthly payments made by petitioner to Ms. Wagner in each of the years in issue, pursuant to the Annulment Agreement, are properly characterized as deductible alimony under section 215(a), as petitioner contends, or as nondeductible payments in settlement of a claim for damages, as determined by respondent. Petitioner bears the burden of proving respondent's determination wrong. See Rule 142(a).

Evidentiary Issues

As a preliminary matter, we must decide respondent's objection to the introduction of 18 joint exhibits. Four of the joint exhibits relate to the divorce proceeding between petitioner and Ms. Wilma Rae Pettid. They are described as follows:

5-E  Decree dissolving petitioner's marriage to Ms. Wilma Rae Pettid, issued by the District Court of Douglas County, Nebraska, on March 12, 1982.

6-F  Property Settlement Agreement executed by and between petitioner and Ms. Wilma Rae Pettid.

7-G  Answers to Interrogatories filed in the divorce proceeding.

8-H  Affidavit RE: Application for Support, Fees, Custody, Etc. and Financial Statement, filed in the divorce proceeding.

Fourteen of the joint exhibits relate to the purported marriage of and subsequent annulment proceeding between petitioner and Ms. Wagner.  They are described as follows:

9-I  Marriage License issued to petitioner and Ms. Wagner on May 5, 1982, by the Office of the County Judge for Douglas County, Nebraska.

10-J  Excerpt from a record containing Ms. Wagner's testimony taken in a deposition in connection with the annulment proceeding.

12-L  Affidavit RE: Application for Support, Fees, Custody, Etc. and Financial Statement, filed by petitioner in the annulment proceeding.

13-M  Affidavit RE: Application for Support, Fees, Custody, Etc. and Financial Statement, filed by Ms. Wagner in the annulment proceeding.

15-O  Motion for temporary support filed by Ms. Wagner in the annulment proceeding.

16-P  Temporary Order issued by the District Court of Douglas County, Nebraska, in the annulment proceeding.

17-Q  Certificate of Readiness for Trial prepared by Ms. Wagner's attorney in the annulment proceeding.

23-W  Draft of the Settlement Agreement and Mutual Release.

24-X  Letter from petitioner's attorney to Ms. Wagner's attorney, dated February 24, 1992.

25-Y  Letter from petitioner's attorney to Ms. Wagner's attorney, dated October 6, 1992.

26-Z  Letter from Ms. Wagner's attorney to petitioner's attorney, dated October 19, 1992.

27-AA  Letter from petitioner's attorney to Ms. Wagner's attorney, dated November 3, 1992.

28-AB   Acknowledgment of Receipt and Release, executed by Ms. Wagner on July 1, 1994, and filed on July 12, 1994.

29-AC   Ms. Wagner's Answer to Request for Admission, dated August 11, 1992, executed in connection with the annulment proceeding.

Respondent's counsel set forth his objection to the exhibits in paragraph 7 of the stipulation of facts and paragraph 55 of the supplement to stipulation of facts, which state as follows:

> 7.  Respondent also objects to admission into evidence of Joint Exhibits 5-E, 6-F, 7-G. 8-H, 9-I, 10-J, 12-L, 13-M, 15-O, 16-P, 17-Q, 23-W, 24-X, 26-Z, 27-AA, and 28-AB on the grounds that the Annulment Agreement * * * represents the complete understanding of the parties and constitutes a full and final settlement of all claims or claims against the other, known or unknown, without any reservation of any rights, either in law, equity, tort, contract, or in any other fashion, and may not be modified except in writing and signed by all of the parties.  Joint Exhibits 5-E, 6-F, 7-G, 8-H, 9-I, 10-J, 12-L, 13-M, 15-O, 16-P, 17-Q, 23-W, 24-X, 26-Z, 27-AA, and 28-AB could not be admitted as parole [sic] evidence in an action between Pettid and Wagner to alter the construction of the Annulment Agreement or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.  Commissioner v. Danielson, 378 F.2d 771, 775 (3rd Cir. 1967). * * *

> 55.  In paragraph 7 of the Stipulation of Facts, Respondent objected to admission of several Joint Exhibits into evidence.  Respondent continues to object to all of the Joint Exhibits listed in paragraph 7 of the Stipulation of Facts and now adds Joint Exhibits 25-Y and 29-AC. * * *

Although nominally phrased in terms of the parol evidence rule, respondent's objection is based on the application of the court's holding in Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965). In that case, the taxpayers executed covenants not to compete and a purchase agreement in connection with their sale of stock. The documents specifically allocated a portion of the total consideration to the covenants not to compete. Nevertheless, on their tax returns, the taxpayers reported the entire amount received from the buyer as proceeds from the sale of stock. The taxpayers argued that the allocation of the buyer's consideration in the covenants not to compete and the purchase agreement had no basis in fact or economic reality and that taxation should be based on the substance of the transaction. In response to the taxpayers' argument, the Court of Appeals adopted the following rule:

> a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * *

Id. at 775. This Court has not adopted the rule enunciated by the Court of Appeals for the Third Circuit in

Commissioner v. Danielson, supra.  See Norwest Corp. v. Commissioner, 111 T.C. 105, 142 (1998); Coleman v. Commissioner, 87 T.C. 178, 202 n.17 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987); Elrod v. Commissioner, 87 T.C. 1046, 1065 (1986); G.C. Servs. Corp. v. Commissioner, 73 T.C. 406, 412 n.2 (1979).

On brief, respondent's counsel expanded the basis for his objection to include two additional theories: The "strong proof" rule and the holding of Grummer v. Commissioner, 46 T.C. 674 (1966).  Under the "strong proof" rule, adopted by this Court, a taxpayer can ignore the unambiguous terms of a binding agreement only if the taxpayer presents "strong proof," that is, more than a preponderance of the evidence, "that the terms of the written instrument" do "not reflect the actual intention of the parties thereto."  G.C. Servs. Corp. v. Commissioner, 73 T.C. at 412; Meredith Corp. & Subs. v. Commissioner, 102 T.C. 406, 440 (1994); Major v. Commissioner, 76 T.C. 239, 247 (1981).  Similarly, the holding in Grummer v. Commissioner is stated as follows:

> extrinsic evidence designed to alter the language of a divorce decree or separation agreement will not be considered in determining whether payments constitute alimony or child support when the agreement of the parties specifically and unequivocally fixes the character of such payments.  * * *

Grummer v. Commissioner, 46 T.C. at 680.  In that case, the Court found "no ambiguity of the agreement."  Id. at 679.

The Danielson rule, the "strong proof" rule, and the Grummer holding all relate to the same issue:  whether a party to a binding agreement should be permitted to avoid the tax consequences that would otherwise flow from the unambiguous terms of the agreement.  The Danielson rule and the "strong proof" rule differ in the level of proof necessary to challenge the tax consequences of an agreement.  The Grummer case adopts a rule prohibiting consideration of extrinsic evidence in interpreting the unambiguous language of a divorce decree or separation agreement.

None of the three theories relied upon by respondent apply to the instant case.  All three theories apply only in the case of an unambiguous agreement.  However, we find paragraph 1.f) of the Annulment Agreement to be ambiguous because it does not state whether, or to what extent, the "periodic support payments" are in settlement of a claim for damages under the Bartling lawsuit or are payments in connection with the annulment of petitioner's purported marriage to Ms. Wagner.  Paragraph 1 of the Annulment Agreement states that the transfers of property and

payments are in "full and complete settlement toward the claims in the Annulment Lawsuit and the Bartling Lawsuit."

Petitioner is not attempting to alter the unambiguous terms of the Annulment Agreement and, thus, avoid the tax consequences that flow from this Agreement. Rather, by introducing the joint exhibits into evidence, petitioner seeks to produce evidence contrary to respondent's position that the subject payments are "in settlement of a claim for damages" (i.e., the Bartling lawsuit) and to prove that the parties to the Annulment Agreement intended the "periodic support payments" to qualify as "alimony or separate maintenance." Accordingly, we overrule respondent's objection to the joint exhibits.

Respondent also objects to paragraph 6 of the stipulation of facts and paragraph 53 of the supplement to stipulation of facts, relating to respondent's treatment of the payments received by Ms. Wagner. Paragraph 6 of the stipulation of facts states in pertinent part as follows:

> 6. Pettid (i.e. Petitioner) asserts that for the same three tax years [1993, 1994, and 1995], the Commissioner * * * determined that the same $4,000.00 monthly payments that Pettid made to Wagner were alimony includable in her gross income. * * *

Paragraph 53 of the supplement to stipulation of facts provides in pertinent part as follows:

53. On November 27, 1996, Respondent issued a notice of deficiency to Inga Wagner, for tax years 1993 and 1994, in which Respondent determined that Inga Wagner was liable for tax on the payments she received from Petitioner, Fred J. Pettid, in response to paragraph 1.f) of the Annulment Agreement. * * *

Respondent objects to the above-quoted statements on the ground that the determinations made by the Commissioner with respect to the treatment of the payments in Ms. Wagner's returns are not probative as to the treatment of the payments in petitioner's returns.

Petitioner did not address respondent's objection on brief, and, thus he has conceded it. See Lime Cola Co. v. Commissioner, 22 T.C. 593, 606 (1954) (stating that because petitioners did not address transferee liability on brief, petitioners had conceded the issue); Levert v. Commissioner, T.C. Memo. 1989-333 (stating that respondent had conceded the taxpayer's liability for an addition to tax that was determined in the notice of deficiency by failing to discuss the issue on brief). Accordingly, we sustain respondent's objection to the admission of paragraph 6 of the stipulation of facts and paragraph 53 of the supplement to stipulation of facts.

Alimony or Separate Maintenance

The principal issue in this case is whether the payments made by petitioner to Ms. Wagner are properly characterized as "alimony or separate maintenance payments," deductible under section 215(a). Section 215(b) provides that the term "alimony or separate maintenance payment" means "any alimony or separate maintenance payment (as defined by section 71(b)) which is includible in the gross income of the recipient under section 71." Section 71(b) provides as follows:

> SEC. 71(b). Alimony or Separate Maintenance Payments Defined.--For purposes of this section--
>
> (1) In General.--The term "alimony or separate maintenance payment" means any payment in cash if--
>
> (A) such payment is received by (or on behalf of) a spouse under a divorce or separation instrument,
>
> (B) the divorce or separation instrument does not designate such payment as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215,
>
> (C) in the case of an individual legally separated from his spouse under a decree of divorce or of separate maintenance, the payee spouse and the payor spouse are not members of the same household at the time such payment is made, and

(D) there is no liability to make any such payment for any period after the death of the payee spouse and there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse.

If the payments made by petitioner fail to meet each of the four criteria enumerated by section 71(b)(1), then the payments are not "alimony or separate maintenance payments" and are not deductible by petitioner under section 215(a).

As stated in respondent's reply brief, "Both petitioner and respondent agree that payments made by petitioner meet the requirements contained in I.R.C. sec. 71(b)(1)(A), (B), and (C)." Therefore, the sole question remaining is whether the subject payments satisfy the requirements of subparagraph (D).

Respondent takes the position that the requirements of subparagraph (D) are not satisfied for the following two reasons: "First, there is no reference in the Annulment Agreement which requires the termination of the support payments upon Wagner's death. Second, there appears to be a specific requirement in the agreement for Pettid to continue the payments should Wagner die."

Contrary to respondent's first position, we conclude that petitioner's liability to make payments under paragraph 1.f) of the Annulment Agreement terminates upon

the death of Ms. Wagner by operation of Neb. Rev. Stat.
section 42-365, which provides as follows:

> Decree; alimony; division of property; criteria;
> modification; revocation; termination.  When
> dissolution of marriage is decreed, the court
> may order payment of such alimony by one party
> to the other and division of property as may be
> reasonable, having regard for the circumstances
> of the parties, duration of the marriage, a
> history of the contributions to the marriage by
> each party * * * and interruption of personal
> careers or educational opportunities * * *
> <u>Except as otherwise agreed by the parties in
> writing or by order of the court, alimony orders
> shall terminate upon the death of either party or
> the remarriage of the recipient</u>.
>
> The purpose of alimony is to provide for the
> continued maintenance or support of one party by
> the other when the relative economic circum-
> stances and the other criteria enumerated in this
> section make it appropriate.  [Emphasis added.]

Neb. Rev. Stat. sec. 42-365 (1988).

Neb. Rev. Stat. section 42-365 provides that the payor's
liability to make payments under "alimony orders"
terminates by operation of law upon the death of either
spouse or the remarriage of the recipient spouse, "except
as otherwise agreed by the parties in writing or by order
of the court".  We note that respondent does not argue that
the district court's decree is not an "alimony order."  In
this case, neither the Annulment Agreement nor the Decree
of Annulment provides for the termination of the payments

required under paragraph 1.f) of the Agreement.  Thus, petitioner's liability to make the payments terminates by operation of Neb. Rev. Stat. section 42-365 upon Ms. Wagner's death.

Under Nebraska law, there is a distinction between "annulment" and "divorce".  Annulment is the declaration by a court that a purported marriage is null and void, as if the marriage had not occurred.  See Neb. Rev. Stat. sec. 42-119 (1988).  Divorce is the termination of a valid and binding marriage.  See Neb. Rev. Stat. sec. 42-347(2) (1988).  Notwithstanding this distinction, annulment actions are brought in the same manner as divorce actions and are subject to the same provisions of the Nebraska Divorce and Alimony Law.  See Neb. Rev. Stat. sec. 42-373 (1988).

Our interpretation of Neb. Rev. Stat. section 42-365 is supported by the holding in Euler v. Euler, 295 N.W.2d 397 (Neb. 1980).  The issue in Euler v. Euler was whether, under Neb. Rev. Stat. section 42-365, the remarriage of the ex-wife caused the termination of the payment of alimony to her.  The court held that:

> Neither the property settlement nor the decree provides for the termination of alimony upon the occurrence of a specified event set out in the agreement, nor does either state that the agree-ment shall not be subject to amendment or

revision.  Section 42-365 clearly states that alimony payments will terminate by operation of law when a decree is silent on the effect of death or remarriage.  [Emphasis added.]

Id. at 400.

Respondent attempts to distinguish Euler v. Euler by noting that the agreement in that case expressly permitted modification.  Respondent argues that the court in Euler v. Euler concluded that termination language could be added to the agreement.  In this case, on the other hand, respondent argues that the Annulment Agreement does not permit modification, and that language terminating petitioner's liability to make the subject payments upon the death of Ms. Wagner cannot be added.

We disagree.  We do not agree that the statutory direction set forth in Neb. Rev. Stat. section 42-365 can be defeated by a general contractual provision prohibiting modification of the agreement.  If Neb. Rev. Stat. section 42-365 applies, a payor's liability to pay alimony terminates automatically by operation of law upon the death of the payee.  As the court stated in Kingery v. Kingery:

> The words, "terminate upon the death of either party or the remarriage of the recipient," clearly show that this portion of the statute needs no order of court to effect termination. The alimony terminates by operation of law when the condition occurs.

<u>Kingery v. Kingery</u>, 320 N.W.2d 441, 443 (Neb. 1982). Thus, if Neb. Rev. Stat. section 42-365 applies, liability to make the payments terminates without a court order. Similarly, the termination takes place without "modification" of the Annulment Agreement or the Decree of Annulment.

Respondent cites <u>Watters v. Foreman</u>, 284 N.W.2d 850 (Neb. 1979), in support of his position that section 71(b)(1)(D) is not satisfied because paragraph 1.f) of the Annulment Agreement does not explicitly provide for termination of the subject support payments upon the death or remarriage of Ms. Wagner. The issue in <u>Watters v. Foreman</u>, <u>supra</u>, was whether the remarriage of the payee spouse resulted in the termination of alimony by operation of Neb. Rev. Stat. section 42-365. The court decree stated that the payments would cease upon the payee's death, but it was silent about remarriage.

In support of his position that his obligation to pay alimony terminated upon his ex-wife's remarriage, the payor, Foreman, argued that Neb. Rev. Stat. section 42-365 required termination of the alimony payments upon the remarriage of his ex-wife. The court in <u>Watters v. Foreman</u>, <u>supra</u>, held:

> Where the parties by their agreement in writing, or the court by its decree, provide that a specific amount of alimony shall be paid for a specific period of time, and shall terminate only upon the occurring of a specific event set out in the agreement or decree and otherwise shall not be subject to amendment or revision, the payments of such alimony shall terminate only upon the happening of the event set out in the agreement or decree.

Id. at 854.

Respondent notes that in Watters v. Foreman, supra, the parties to the written agreement did not include the remarriage of the ex-wife as a ground for termination, and the agreement stated that it was final and complete and not subject to revision or amendment. According to respondent, the same result should follow in the instant case because the Annulment Agreement likewise does not include the death of Ms. Wagner as a ground for termination and states that it is final and complete and not subject to revision or modification.

We believe that Watters v. Foreman, supra, is distinguishable from the instant case. In Watters v. Foreman, supra, the decree fit within the "Except as otherwise agreed by the parties in writing or by order of the court" language of Neb. Rev. Stat. section 42-365 because the decree expressly dealt with termination and provided that termination would occur upon the death of the payee spouse.

In the instant case, on the other hand, the Annulment Agreement is silent about termination and is silent about the effect that the death or remarriage of Ms. Wagner will have on the payments required under paragraph 1.f).  Thus, the parties to the Annulment Agreement have not "otherwise agreed" in writing regarding the effect of the death or remarriage of Ms. Wagner on petitioner's liability to make payments under paragraph 1.f).  In such a case, by operation of Neb. Rev. Stat. section 42-365, the payments automatically terminate upon the death of petitioner or of Ms. Wagner or remarriage of Ms. Wagner.

Respondent further argues that section 71(b)(1)(D) is not satisfied because petitioner, or his estate "may be required to make payments [under the Annulment Agreement] after Ms. Wagner's death."  To support this argument respondent makes three points.  First, respondent notes that paragraph 10 of the Annulment Agreement provides: "This Agreement shall be binding upon the parties, their respective heirs, successors, administrators, assigns and personal representatives."  Second, respondent argues that, because the Annulment Agreement provides that it cannot be modified, it is equivalent to a judgment on which Ms. Wagner's heirs could bring an action.  Third, respondent asserts that "the Annulment Agreement is a

settlement of the Bartling Lawsuit", a "tort suit," and the payments in issue "are simply the periodic payment of a damage award" that could be enforced against petitioner by Ms. Wagner's heirs.

Unlike respondent, we do not believe that any provision of the Annulment Agreement or the Decree of Annulment requires petitioner to continue making the monthly payments under paragraph 1.f) of the Agreement after Ms. Wagner's death. As to the first and second points raised by respondent, we do not agree that the "binding agreement" provision or the "no modification" provision of the Annulment Agreement can be read so broadly as to require the payments to continue after Ms. Wagner's death or to constitute an agreement of the parties that the alimony order will not terminate on Ms. Wagner's death, as otherwise required by Neb. Rev. Stat. section 42-365.

We also disagree with respondent's third point, that the Annulment Agreement is a settlement of the Bartling lawsuit, a tort action, and the payments in issue are periodic payments of a damage award that could be enforced by Ms. Wagner's heirs. While we agree that the Bartling lawsuit was settled in the Annulment Agreement, we do not agree that it was necessarily a tort action or that the subject payments relate to an award of damages.

Accordingly, by operation of Neb. Rev. Stat. section 42-365, the payments described by paragraph 1.f) of the Annulment Agreement terminate upon the death of Ms. Wagner. Thus, the payments constitute "alimony" under section 71(b) because "there is no liability to make any such payment for any period after the death of the payee spouse and there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse" as required by section 71(b)(1)(D). Therefore, we find that the subject payments constitute "alimony or separate maintenance payments" within the meaning of section 71(b) and are deductible under section 215(a).

To reflect the foregoing,

Decision will be entered under Rule 155.